942 A.2d 59 (2008)
398 N.J. Super. 361
HARRISON REDEVELOPMENT AGENCY, Plaintiff-Respondent,
v.
Anthony J. DeROSE, Defendant/Counterclaimant/Third-Party-Plaintiff-Appellant,
v.
Town of Harrison and Planning Board of the Town of Harrison, Third-Party Defendants-ReSpondents.
Harrison Redevelopment Agency, Plaintiff-Respondent,
v.
Anthony J. DeRose, Defendant-Appellant, and
Office of the Public Defender, Sears Roebuck and Co., Charles A. Stanziale, Jr., Bankruptcy Trustee, State of New Jersey Department of Labor and Workforce Development Division of Workers' Compensation Uninsured Employers Fund, State of New Jersey Department of the Treasury Division of Taxation, and Town of Harrison, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued[1] February 4, 2008.
Decided February 25, 2008.
*62 Richard P. De Angelis, Jr., argued the cause for appellant (Franzblau Dratch, and Stryker, Tams & Dill, LLP, attorneys; Mr. De Angelis, of counsel; Mr. De Angelis and Patrick T. Collins, Livingston, on the brief).
Gregory J. Castano, Jr., West Caldwell, argued the cause for respondents (Castano Quigley, LLC, attorneys; Mr. Castano, on the brief).
Ronald K. Chen, Public Advocate, argued the cause for amicus curiae Department of the Public Advocate of New Jersey (Ronald K. Chen, Public Advocate, attorney; Mr. Chen, Catherine Weiss, Director, Division of Public Interest Advocacy, Jean Reilly, Deputy Director, Division of Public Interest Advocacy, Brian Weeks, Deputy Public Advocate, Fenix Manning-Bowman, Assistant Deputy Public Advocate, and Flavin Komuves, Deputy Public Advocate, on the brief).
Daniel P. Reynolds, Senior Deputy. Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Anne Milgram, Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Mr. Reynolds, on the brief).
Before Judges PARRILLO, SABATINO and ALVAREZ.
The opinion of the court was delivered by
SABATINO, J.A.D.
These consolidated appeals, along with two companion cases we also decide today,[2] converge at the intersection of our state's laws regulating the government's taking of private property for purposes of redevelopment. The central and recurring question before us is whether a property owner who fails to challenge a redevelopment designation containing his or her property within forty-five days of its adoption by a municipal governing body, pursuant to the Local Redevelopment and Housing Law ("LRHL"), N.J.S.A. 40A:12A-1 to -49, may still challenge, in full or in part, the public purpose of the taking of his or her property, by way of a defense in an ensuing condemnation action. To date both this court and the trial courts have rendered conflicting answers to that fundamental question in unpublished decisions.
The importance of such matters of timeliness is heightened by the fact that the LRHL does not, as it is presently worded, require a municipal governing body to provide individual advance notice to an owner that it is considering designating his or her property for redevelopment, and thus may take that property in the future through the power of eminent domain. Nor are property owners entitled under the LRHL to individual notice after a governing body approves such a designation, unless the owner had previously filed a written objection while the proposed redevelopment was being preliminarily evaluated by the local planning board.
We now rule on these unsettled questions of widespread importance, and the related question of the validity of the LRHL's notice provisions under the Federal and State Constitutions.
We hold that, unless a municipality provides the property owner with contemporaneous written notice that fairly alerts the owner that (1) his or her property has been designated for redevelopment, (2) the designation operates as a finding of public *63 purpose and authorizes the municipality to acquire the property against the owner's will, and (3) informs the owner of the time limits within which the owner may take legal action to challenge that designation, an owner constitutionally preserves the right to contest the designation, by way of affirmative defense to an ensuing condemnation action. Absent such adequate notice, the owner's right to raise such defenses is preserved, even beyond forty-five days after the designation is adopted.
Conversely, we also hold that if the municipality's notice does contain these constitutionally-essential components, an owner who wishes to challenge, the designation presumptively must bring an action, in lieu of prerogative writs, within forty-five days of the municipality's adoption of the designation. The owner who is provided with such adequate notice ordinarily cannot wait to raise those objections as a defense in a future condemnation action. This presumption of a time bar shall be especially strong with respect to general attacks on the validity of the redevelopment designation raising issues that are not specific to the owner's parcel. In recognition of our judiciary's ultimate constitutional authority over matters of practice and procedure, trial judges retain the residual power, however, to extend the time for the assertion of all claims of invalidity, where necessary to serve the interests of justice, even after the forty-five days have elapsed.
By so ruling, we endeavor to harmonize the terms and objectives of the LRHL with those of the Eminent Domain Act, N.J.S.A. 20:3-4 to -50, and our Rules of Court. Such a harmonized reading of the applicable statutes and rules also ensures that our redevelopment laws pass muster under the Due Process Clause of the Federal Constitution and separation of powers principles under the State Constitution. It also relieves property owners and the public at large of the burdens of engaging in premature litigation, so that owners are not forced to go to court unless and until they receive fair and adequate notice of the municipality's adverse determination and of its right to take their properties.
Because the notice afforded to property owners in this case was constitutionally inadequate, the Law Division erred in deeming time-barred appellant's defenses to the attempted condemnation of his property. We therefore vacate its orders and remand for further proceedings. On remand, the trial court shall consider the merits of appellant's contention that the proposed taking of his property for redevelopment violates the LRHL and the Blighted Areas Clause of the New Jersey Constitution. In particular, the trial court must assess, among other things, whether the forced acquisition of appellant's land for redevelopment satisfies the criteria the Supreme Court recently expressed in Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 924 A.2d 447 (2007).

I.
Although we have been called upon to resolve several rather abstract issues arising under our laws and constitutions, we undertake that responsibility mindful that these cases, in a very tangible way, involve a real community, and the real people who live, work and own property there. That community is the Town of Harrison, a small enclave in Hudson County consisting of 1.2 square miles and inhabited by about 15,000 residents.
Harrison's Characteristics and Its Economic History
The Town of Harrison is bordered on the west and south by the Passaic River, on the north by East Newark, and on the east by Kearny. The Town is bisected by Route 280, and includes a stop on the *64 PATH rail line that runs from Newark to New. York City. The Harrison waterfront area along the Passaic River was originally settled in the seventeenth century, as the river provided an important means of transportation. By the early part of the twentieth century, the Town had attracted substantial industry, including manufacturers of brick, wire cloth, gypsum, cans, elevators and trunks, as well as an oil refinery and a lumber yard. These industries took advantage of the area's proximity to the Passaic River and the numerous rail lines traversing the Town. The Town's residential districts were mainly situated away from the Passaic River and the industrial and commercial zones. The Town once housed a professional baseball stadium, which has since been demolished.
As the economy matured, many of the heavy industrial businesses in Harrison gradually began to cease their operations. Factory buildings in the Town were largely replaced or adapted to light industrial uses. Warehouses and distribution facilities became more prevalent. These trends increased truck traffic on local streets. The PATH station's ridership precipitated the need for greater commuter parking. As the old industrial firms in Harrison closed shop, the Town's tax base diminished.
Meanwhile, the surrounding region underwent its own transformation. In recent decades, substantial investment and redevelopment have occurred nearby in the City of Newark, whose commercial district is situated close to Harrison on the opposite side of the Passaic River. Those changes in Newark include, among other things, the construction of several modern office towers; new classroom buildings for Rutgers University and Seton Hall University; an additional federal courthouse and refurbished State court buildings; the New Jersey Performing Arts Center; an ice hockey arena; and a minor-league baseball park.
Anthony J. DeRose, His Business and the Subject Property
Defendant Anthony J. DeRose[3] is a small-business owner who has operated Tony's Truck Tire Repair for thirty-six years. DeRose runs the business with his wife and one part-time employee. For years, Tony's Truck Tire Repair has obtained work through a contract with the New Jersey Turnpike Authority. The contract authorizes DeRose's company to change and repair bus and truck tires of vehicles that become disabled on the Turnpike between Exits 13 and 18W. The repair shop is on call twenty-four hours per day, seven days per week. When the shop receives a call for assistance, its service truck goes to the location of the disabled vehicle. The tire repairs are usually performed roadside, although occasionally the disabled vehicle is taken back to the shop.
On September 8, 1997, DeRose purchased a property in Harrison designated as Block 99, Lots 40 to 44, and more commonly known as 200-208 Middlesex Street. The sale price was $260,000. The property consists of .29 acres, and is located in the town's "I-B" industrial zone. The property houses a 11,500 square-foot brick structure, most of which is a garage. The structure was built in the early 1900's as part of the former Driver-Harris factory complex.
Since acquiring the property, DeRose has used it to conduct the business of Tony's Truck Tire Repair. He keeps his two service vans and a small dump truck *65 on site, plus an inventory of about three hundred varieties of tires. DeRose rents out a portion of the property to an HVAC contracting firm, which also uses the premises as a base for off-site service calls. There is no retail activity on the premises. The business uses on site conform with the requirements of the I-B zone. In or about 2000, DeRose performed various renovations to the property, including the installation of new electrical and gas service, upgraded plumbing, new doors, walls and window frames, and new sidewalks and a concrete apron.
The record reflects that Tony's Truck Tire Repair has generally earned gross revenues of $500,000 to $600,000 annually. The business takes advantage of its close proximity to an interchange of the Turnpike, allowing it to respond quickly to roadside service calls. DeRose contends that his company has never received a citation for municipal code violations, and that he has operated it profitably and without complaints from neighbors. A professional apappraisal of the property conducted in 2007 at the Town's request valued the property at $780,000.[4]
Harrison's Redevelopment Activities
Recognizing the disadvantages of Harrison's old industrial character and its shrinking tax base, Town officials began to embark on a path towards an ambitious redevelopment, one that ultimately involved almost a third of the Town's acreage. In May 1995, a study of the Town's Master Plan recommended that the governing body pursue such redevelopment. On April 1, 1997, the Harrison Mayor and Council authorized the Town's Planning Board to conduct "a preliminary investigation" as to whether an area within the Town, identified by blocks and lots in an attached schedule, qualified as an "area in need of redevelopment," pursuant to N.J.S.A. 40A:12A-5.
The area in question, generally located in the western portion of the Town near the Passaic River, "represents approximately 32 percent of the Town's area" and "consists of 250+ acres of land located on the Passaic River and between and around Interstate Route 280 and the Amtrak railroad tracks in Harrison." As described in the record, the structures within the targeted area, generally built in the early 1900's, had been "part of large industrial complexes" that were used primarily for commercial purposes, though some were used as residences.
As requested by the governing body, the Planning Board passed a resolution on May 9, 1997, commissioning the planning firm of Moskowitz, Heyer and Gruel to prepare a map of the Study Area, evaluate the properties within that area under the redevelopment criteria set forth in the LRHL, and specify those properties that the firm deemed to be in need of redevelopment or rehabilitation. The. Board's resolution, was published in local newspapers.
The Gruel Report
In July 1997 the consultants issued a forty-eight page report, plus appendices, under the signature of Susan S. Gruel, P.P. (the "Gruel Report"). The Gruel Report concluded that every one of the eighty parcels identified in the schedule attached to the Town's prior resolution was in need of redevelopment or otherwise suitable for acquisition under the criteria of the LRHL. Throughout her report, Gruel noted that properties within the area under study were "underutilized" and in need of repair. She observed that "[i]n an effort to reuse the structures once associated *66 with [the former] large [industrial] complexes, individual buildings have been sold or leased to independent operations, with little improvements or alterations, or consideration of new accesses or circulation patterns." Gruel opined that "[t]his piecemeal reuse and diverse ownership has [led] to underutilization and obsolescence of large-scale factory buildings."
With respect to transportation, Gruel observed that "[n]ew development in the Study Area has been constrained by the problems of internal accessibility despite its excellent regional access." She added that "[t]raffic congestion, narrow roads, inadequate internal circulation patterns and poor road conditions have hampered new development in the area" and that any redevelopment "will require investment in roadway improvements" and the planning of "efficient internal circulation patterns."
As to the subject property at 200-208 Middlesex Street, "Parcel # 28," which was then owned by Irving Adler,[5] the Gruel Report presented the following observations:
Parcel # 28 contains a brick 1-story manufacturing structure and a brick 1-story garage structure, both of early 20th century construction. These structures are remnants of the Driver-Harris factory complex. The 1-story structure is utilized for Custom Concepts custom cabinetry manufacturing operations. The 2-story garage has sliding aluminum doors and is utilized for dump truck storage, not related to the cabinetry operation. Trucks utilizing this garage must maneuver in the South Second Street right-of-way to back into the garage. The two structures completely cover all five lots in this area. A trash dumpster is stored on the public side-walk in front of the structure that fronts on Middlesex Street.
Based upon these observations, Gruel concluded that Parcel # 28 was specifically in need of redevelopment under the LRHL's criteria, as set forth at N.J.S.A. 40A:12A-5(d) and (e):

Redevelopment Criteria: This parcel meets criteria d and e [of N.J.S.A. 40A:12A-5]. The structures of this parcel lack proper utilization. They have been altered little for the new operations therein. The garage structure is underutilized and is not appropriately utilized. The manufacturing building is approaching obsolescence due to its age.
The Planning Board's Preliminary Investigation
After receiving the Gruel Report, the Planning Board issued a written notice, dated July 17, 1997, announcing that it would conduct a public hearing, pursuant to N.J.S.A. 40A:12A-6, on August 7, 1997. The notice was signed by the Town Engineer. The stated purpose of the hearing was "to determine whether portions of the Town of Harrison, as more particularly described [therein], should be designated as a `redevelopment area' according to criteria set forth in Section 5 of the [LRHL]." Because it is germane to the constitutional arguments before us, we present the full text of that notice:
PLANNING BOARD
TOWN OF HARRISON
HUDSON COUNTY
NEW JERSEY
NOTICE
PLEASE TAKE NOTICE that on Thursday August 7, 1997 at 7:00 p.m., at *67 the Harrison High School Auditorium, 1 North Fifth Street, Harrison, New Jersey, the Planning Board of the Town of Harrison will hold a public hearing pursuant to Section 6 of the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 et seq. The purpose of the hearing will be to undertake a preliminary investigation to determine whether portions of the Town of Harrison, as more particularly described be low, should be designated as a "redevelopment area" according to criteria set forth in Section 5 of the Local Redevelopment and Housing Law.
The area which is the subject of this preliminary investigation (referred to herein as the "Study Area") consists of approximately 250 acres of land located on the Passaic River and between and/or around Interstate Route 280 and the Amtrak railroad tracks in the Town of Harrison. The western border of the Study Area stretches south along the Passaic River from Harrison Avenue to the Flexo-Craft light industrial complex at the south end of vacated First Street. The Study Area then extends eastward along the Passaic River toward the end of Cape May Street and the PATH property and northward to the Amtrak railroad tracks, Interstate Route 280, and Bergen Street.
A map delineating the Study Area has been prepared and may be inspected at the Office of the Municipal Clerk, 318 Harrison Avenue, Harrison, New Jersey. For the convenience of readers of this notice, a copy of this map is included as a part of this notice.
A report entitled "Redevelopment Area Study, Town of Harrison, Hudson County, New Jersey" prepared by Moskowitz, Heyer & Gruel, P.A., community planning consultants, dated July 1997, has also been prepared and a copy is also available for inspection in the Office of the Municipal Clerk at the address stated above.
If interested, you may appear and be heard at the public hearing.
 ___________________________
/s/ Joseph A. Cundari, Engineer
Town of Harrison
 Dated: July 17, 1997
This notice announcing the Planning Board's August 7 public hearing was published in The Star Ledger and The Jersey Journal on July 23 and 28, 1997. The notice was republished in The Jersey Journal on the day of the hearing. Additionally, the notice was broadcasted on a local cable access channel on each of the two days preceding the hearing.
Apart from these means of general publication, the Planning Board's notice was sent, via certified mail, to all property owners within the designated area on July 24, 1997. At the time these notices were sent, DeRose did not yet own the subject premises at 200-208 Middlesex Street, as he then was under contract to purchase them from Irving Adler. However, DeRose acknowledges that he separately received a mailed copy of the notice because he had owned another parcel[6] at that time in the designated area.
The August 7, 1997 Planning Board Meeting
The Planning Board conducted the anticipated public hearing on August 7, 1997. The Board prepared and distributed a two-page handout to members of the public who were in attendance. The handout contained three sections, covering (1) the *68 purpose of the meeting, (2) the general purposes of redevelopment, and (3) a statement preemptively addressing residents' concerns on how they might be affected.
With respect to the purpose of the meeting, the handout advised residents that the Planning Board's determination that night "will not be a final binding decision" and that the Town Council would have "the final say":
THE PURPOSE OF TONIGHT'S MEETING
Tonight the Board will hold a public hearing on whether a particular segment of the Town meets state statutory criteria for designation as a "redevelopment area." The location and boundaries of this area (the "Study Area") will be identified early in tonight's meeting.
The Board has been directed to undertake the investigation of this issue by the Town Council. The Board's decision on the issue will not be a final binding decision. Rather, it will be a recommendation to the Town Council. The Town Council will have the final say on the issue.
[Emphasis added.]
In its next section, the handout summarized the general legislative purposes of redevelopment in favorable language. It also informed the attendees that the designation of land as a redevelopment area was only "the first step" in the redevelopment process:
THE PURPOSE OF REDEVELOPMENT
The New Jersey Legislature has enacted laws that permit municipalities to redevelop areas in their communities where facilities are deteriorated, not fully productive, or otherwise detrimental to the safety or welfare of the community. Redevelopment can improve and restore property values, provide new business and housing opportunities, create jobs, improve the municipal tax base, and create a better community in which to live. The designation of an area as a "redevelopment area" is the first step in the redevelopment process.

[Emphasis added.]
Anticipating that residents at the meeting might worry about the individual ramifications of redevelopment, the handout advised that such impacts would not be addressed that evening, but rather would be addressed at a future time. The handout emphasized this advice with italics:
HOW WILL YOU BE AFFECTED?
What kind of redevelopment might take place, and how property owners may be affected, will not be discussed or decided at tonight's hearing. These questions can only be answered when a "redevelopment plan" is adopted. By law, the redevelopment plan must follow the designation as a "redevelopment area."
Before a redevelopment plan is adopted, there must be additional public hearings, and interested parties will have the opportunity to be heard on the specifics of the plan and how the plan might, affect them.

The handout also included a list of instructions for the meeting. The instructions stated that, after the Board Chairperson made opening remarks, the Town Planner would provide "a brief presentation . . . explaining the limits of the Study Area and the basis for the proposal." The instructions directed residents to fill out printed cards in advance if they wished to speak, noting that when such speakers were recognized by the Chair, they would *69 be "permitted to ask questions, make statements, and present evidence."
During the course of the August 7 meeting, Gruel provided a general overview of the contents of her written report and the basis for her recommendations. The transcript indicates that copies of the Gruel Report were not available to the public to peruse at the hearing. When one property owner in attendance complained about the Report's unavailability, the Planning Board's counsel instructed her that copies of the Report could be inspected in the office of the town clerk and at the municipal library.[7]
Several residents addressed the Planning Board at the August 7 hearing and raised questions about the proposed redevelopment. However, those residents did not present formal evidence or testimony from any competing experts. DeRose himself did not attend the hearing.
At two points in the meeting, the Planning Board's retained professionals made public statements that inaccurately, or at best incompletely, described the legal consequences of a redevelopment designation under the LRHL. These two statements, considered in combination, might have discouraged a reasonable layperson hearing those words from mounting opposition to the redevelopment effort at the time.
First, the then-attorney for the Planning Board[8] responded to a resident who had raised concerns about the ultimate outcome of redevelopment, particularly if the redevelopment plans "don't fall into place." In his response, the Board's counsel erroneously stated that the redevelopment designation by the municipality would not "affect anybody's right in property." Specifically, the relevant portion of counsel's exchange with that resident went as follows:
MR. D'ERRICO [THE RESIDENT]: And on the length of this plan, has anyone ascertained how long you expect this redevelopment to take?
MR. BURNS [THE BOARD's COUNSEL]: It hasn't actually been determined yet because we're in a very preliminary stage.

MR. D'ERRICO: My concern isI'm sorry, I don't remember her name. Susan [Gruel] brought it up earlierthank youthat it seems that the cart is being put before the horse that you okay the site for redevelopment but yet you don't have any idea of what you're going to put there and if those ideas don't fall into place and are not approved by your planning board and the community, what happens to that development plan?
MR. BURNS: Well, this designation does nothing to affect anybody's rights in property, okay? Excuse me. So that if no redevelopment plan were ever adopted, things will continue as they are.

MR. D'ERRICO: It will be a moot effort in other words, the redevelopment plan itself, you could just approve it and it would just go back to pro quid.
MR. BURNS: Things would stay the way they are.
[Emphasis added.]
Later in the meeting, Gruel had the following exchange on the record with Richard Saffern, the owner of a local cookie business:

*70 MR. SAFFERN: I represent the family owners of Century Cookies and I second the motion [to approve the Gruel Report's recommendations] and I hope there are positive results from this redevelopment plan that certain industries like ours will be included in there. I can't think of any negative impact besides the possibility that it will raise taxes. Could you give us examples of negative impact from the redevelopment plan?

MS. MICHAELSON [The Board Chairperson]: I don't think it's going to make an impact, but I'll certainly let Susan address that from a professional point of view.
MS. GRUEL: The anticipation is just the opposite, that it would be helpful not only to the property owners within the town, but to the whole town and ideally that would be the case, and it would meet goals and objectives established in the plan. So unanticipated negative impacts could always be for anything, but certainly there is no indication or no desire to have any negative impacts whatsoever, but only positive.

[Emphasis added.]
At the end of the August 7 meeting, the Planning Board voted unanimously to direct its counsel to draft a resolution adopting the Study Area recommended in the Gruel Report, to be acted upon at the Board's regularly-scheduled meeting twenty days later on August 27, 1997. Subsequently, the Board issued a public notice announcing that it expected at the August 27 meeting "to memorialize a Resolution . . . recommending that the Mayor and Council adopt a Resolution determining that the Study Area delineated in [the Gruel Report] is a redevelopment area in accordance with N.J.S.A. 40A:12A-5 and that it be approved as such." The notice was transmitted by fax to The Star Ledger and The Jersey Journal on August 20, 1997. The notice of this regularly-schered Planning Board meeting was not mailed to DeRose or to other property owners.
As anticipated, the Planning Board adopted a resolution on August 27, 1997, concluding that the Study Area "meets the criteria for designation as a `redevelopment area' under N.J.S.A 40A:12A-5." Relying upon the findings in the Gruel Report, the Board determined that the Study Area exhibited:
(a) a growing lack of proper utilization of land caused by conditions of diverse ownership of real property therein and other conditions, resulting in a stagnant and unproductive condition of land which is potentially useful and valuable to serve the public health, safety and welfare; and
(b) buildings and improvements which, by reasons of dilapidation, obsolescence, overcrowding, faulty design, lack of ventilation and light, excessive land coverage, deleterious land use, obsolete layout, and other factors, are detrimental to the health, safety, and welfare of the community.
Consequently, the Board recommended to the Town Council that the area be designated for redevelopment, pursuant to N.J.S.A. 40A:12A-6.
The Mayor and Council's September 4, 1997 Redevelopment Designation
The Harrison governing body took swift action on the Planning Board's recommendations. Only eight days later, on September 4, 1997, the Mayor and Council adopted two resolutions. One resolution recited that "[t]he delineated area [identified in the Gruel Report and the Planning Board's recommendation] is hereby determined to be a redevelopment area as defined in N.J.S.A. 40A:12A-3." A second *71 resolution, issued that same day, directed the Planning Board to "[p]repare a redevelopment plan as defined in N.J.S.A. 40A:12A-3," and to comply with N.J.S.A. 40A:12A-7 in preparing the plan and transmitting it to the Mayor and Council.
Although we presume but cannot confirm from the record[9] that the September 4, 1997 regular meeting of the Town Council was duly advertised in local newspapers, and that the agenda was posted, it is undisputed that the resolutions adopted by the Mayor and Council at that meeting were not thereafter individually mailed to all property owners within the Study Area, including DeRose. Nor is there any proof in the record that the adopted resolutions were published in the newspapers.
The 1998 Redevelopment Plan
About a year later, on September 23, 1998, the Planning Board adopted a resolution approving a specific redevelopment plan, and recommending that plan to the Mayor and Council. Thereafter, a proposed Ordinance, No. 994, was introduced at a Council meeting on October 6, 1998, for the adoption of the plan. A special joint meeting of the Mayor and Council with the Planning Board, at which the proposed plan would be presented, was scheduled for October 20, 1998 at the Harrison High School auditorium. Public notice of that meeting was published in The Jersey Journal on October 13, 1998.
Following that presentation at the high school, the Mayor and Council voted to adopt Ordinance No. 994 on November 16, 1998, with minor exceptions. The plan attached to the ordinance stated, among other things, that it "authorize[d] the Town to exercise its condemnation powers on all properties in the Redevelopment Area, to acquire property or to eliminate any restrictive covenants, easements or similar property interests which may undermine the implementation of the Plan." Additionally, the document assured residents that "[t]he Town plans, however, to continue working with affected property owners and businesses to promote private redevelopment, where appropriate, of the parcels within the Redevelopment Area." , The approved plan, like the earlier redevelopment designation, was not mailed to property owners in the designated area. The only formal notice of the ordinance adopting the plan was through general publication.
It is undisputed that De Rose did not file an action in lieu of prerogative writs or any other legal challenge within forty-five days of the governing body's September 1997 resolution designating his property, and the other seventy-nine parcels within the Study Area, for redevelopment. Nor did DeRose file suit within forty-five days of the governing body's November 1998 adoption of an ordinance approving the redevelopment plan.
In a certification he filed with the Law Division in 2006, DeRose explained that "[w]hile I was aware that the Town was studying and pursuing the redevelopment of certain areas of the Town, it was not made clear to me by either the. Town or [the Town's redevelopment authority] that . . . they intended to condemn my property until about January 2004." DeRose further asserted that he did not file suit against the municipal bodies after learning about these circumstances in January 2004, because he had been informed that the time to bring an affirmative lawsuit challenging the designation of his property had already passed.
*72 DeRose contends that the imposition of such a time bar is fundamentally unfair, because he had not been given personal notice of the designation of his property and had not been advised that the designation entitled the Town to take his property in condemnation. Nor did the Town inform DeRose of the time limits for filing a challenge to the designation. He asserts that, if he had been apprised of those consequences, he would have filed such a timely challenge.
Continued Redevelopment Activities
Meanwhile, Town officials continued to advance the redevelopment effort. On March 26, 1999, the Mayor and Council adopted another ordinance, No. 1010, creating a new public entity, the Harrison Redevelopment Agency ("the Agency"), to implement the previously-approved redevelopment plan. The Agency's creation was also approved by the New Jersey Local Finance Board. The following year, the Agency adopted two resolutions, respectively on April 17 and July 19, 2000, designating a private entity, Harrison Commons, LLC ("Harrison Commons"), as the redeveloper on the project. Thereafter, Harrison Commons began studying, surveying and appraising properties within the redevelopment area. The municipality also amended the redevelopment plan in April 2000, adding more properties.
In June 2003, the Mayor and Council passed a resolution calling for further amendments to the redevelopment plan. They adopted an ordinance approving those amendments in July 2003. The amended plan envisions that the redevelopment area will include a 25,000-seat stadium for the MetroStars professional soccer team, a 3,000-car garage to accommodate both patrons of the stadium and PATH commuters, a 166-room hotel on the waterfront, a mixed-use retail/residential/office complex adjacent to the stadium, a riverfront public park, and other amenities. According to a 2004 status report from the Agency, at least five major redevelopers have been working on the project. Respondents' counsel represented to us at oral argument that at least tens of millions, and perhaps hundreds of millions, of dollars have already been expended in the redevelopment effort.
The Redevelopment Agency's Dealings With DeRose and The DeRose 1 Litigation
In 2004, the Agency began seeking access to DeRose's property for purposes of environmental testing. Initially, in September 2004 and again in November 2005, DeRose allowed Potomac-Hudson Environmental, Inc., an environmental firm hired by the Agency, access to his property to perform Phase I and Phase II environmental tests. In the meantime, DeRose and the Agency engaged in unsuccessful negotiations concerning an acquisition price for the property. In March 2006 DeRose denied the Agency's environmental experts further access. His opposition caused the Agency to file a verified complaint in the Law Division on April 19, 2006, seeking to continue the on-site environmental testing. The Law Division preliminarily granted that application.
On May 15, 2006, DeRose filed an answer in the Law Division, denying the Agency's authority to enter his land, along with a six-count counterclaim and a four-count third-party complaint in lieu of prerogative writs. DeRose's answer included five affirmative defenses, including assertions that the Agency had denied him due process and had failed to demonstrate any right to relief under apapplicable constitutional requirements. The third-party complaint named the Town and the Planning Board as defendants.[10]
*73 Among other things, DeRose's third-party complaint and counterclaim alleged a violation of due process on the ground that DeRose never received individual notice of the blight[11] designation, the adoption of the 1998 redevelopment plan, or the 2003 amended plan. DeRose asserted that because he was denied due process, the Agency did not have the right to condemn his property. In addition, DeRose sought a judicial declaration that the LRHL is unconstitutional, because the statute does not require a municipality to give notice to all property owners within a redevelopment area that their properties have been designated as blighted. Apart from these constitutional arguments, DeRose sought a declaration that the blight designation for his property was factually unsupported by the evidence, and that the Agency thus had no authority to condemn it.
Before the third-party defendants filed a response to DeRose's claims, the trial court heard initial arguments on the issues raised in the pleadings. The Agency argued that it had complied with the LRHL and the Federal and State Constitutions in all respects. The Agency emphasized in this regard that the Planning Board had on file a signature card from DeRose, showing that his household received personal notice of the August 7, 1997 hearing. The Agency asserted that it had no statutory or constitutional obligation to provide DeRose with any further individualized notice, of either the redevelopment designation or the later redevelopment plan adopted by the Mayor and Council. Consequently, the Agency sought to dismiss DeRose's counterclaim.
Following these initial arguments, the court dismissed as moot the Agency's order to show cause, given that the parties had resolved the environmental access issues. Subsequently, the Town and the Planning Board filed a motion to dismiss the third-party complaint. Thereafter, the parties agreed that the court should treat the matter as one for summary judgment. The court accepted that request, and after providing counsel with a chance to supplement the record, it considered the balance of the pending motions.
The Trial Court's September 2006 Decision on DeRose I
By order dated September 22, 2006, the trial judge dismissed with prejudice DeRose's counterclaim and third-party complaint. In essence, the judge ruled that DeRose had lost his ability to challenge the notice because he had waited too long, and because others had reasonably relied on the project moving forward.
In his accompanying letter opinion, the trial judge held that DeRose should have filed an affirmative challenge, through an action in lieu of prerogative writs under R. 4:69-6(a), within forty-five days of the governing body's September 4, 1997 designation of the property as being in need of redevelopment. The judge also noted that, even if one accepted DeRose's contention that he did not obtain actual knowledge until January 2004 that his property could be taken, DeRose should have filed a challenge, at the latest, within forty-five days of that discovery.
The judge also rejected DeRose's argument that the forty-five-day period in R. 4:69-6(a) should be enlarged under the Rule's exception for matters justified by *74 "the interest[s] of justice." See R. 4:69-6(c). The judge found that exception inapplicable, observing that "many owners of properties condemned by the Town pursuant to the [Redevelopment] Plan have settled their claims in reliance on the continuing viability of the redevelopment project." The judge determined that the reliance of those other parties was reasonable, and alluded to an unpublished 2003 opinion of this court[12] that validated Harrison's redevelopment plan. That unpublished opinion, involving different property owners in the Harrison redevelopment zone, upheld a finding by the same trial judge that those particular owners could not pursue affirmative or declaratory challenges to the Town's initiative more than forty-five days after the redevelopment designation and the Town's adoption of a redevelopment plan.
In addition, the trial judge rejected as untimely DeRose's challenge to the constitutionality of the notice provisions in the LRHL. He reasoned that DeRose's asserted right to due process had been forfeited by "delay and [the] reasonable reliance of others." The judge emphasized that "other redevelopment activity has been underway for several years without litigation, including a new waterfront hotel in active use and the ongoing construction and marketing of condominiums."
DeRose appealed[13] that determination. He argues that the Law Division improperly dismissed his affirmative claims as time-barred, including his contention that the statutory notice requirements of the LRHL are constitutionally deficient.
The Eminent Domain Proceedings and The DeRose II Litigation
While the appeal of the Law Division's dismissal of DeRose's affirmative claims was still pending, the Agency took steps to acquire his property through eminent domain. In June 2007, the Agency filed a verified complaint to condemn. DeRose's property, along with a proposed order to deposit funds into the court, and an order to show cause why the Agency should not exercise its power of eminent domain. DeRose opposed the complaint, again asserting, among other things, that the blight designation as to his premises was not supported by substantial evidence. The condemnation case was referred to the same trial judge[14] who had presided over the DeRose I litigation.
On September 6, 2007, the trial judge heard arguments in the eminent domain case. Once again, the judge found DeRose's blight challenge, this time interposed as a defense, time-barred by R. 4:69-6(a). Among other things, the judge observed in his oral ruling that, "given the fact that there's a large redevelopment area," it would be "impractical[ ]" and would "make[ ] no sense" to allow a challenge to the blight designation "every time a property is basically condemned." In this regard, the judge adopted by reference the observations he had made in his *75 earlier September 2006 opinion in DeRose I.
The judge rejected DeRose's assertion that denying him the right to contest the bona fides of the blight designation for his property, as a defense in condemnation, violated the principles recently expressed by the Supreme Court in its intervening opinion in Gallenthin, supra, 191 N.J. at 344, 924 A.2d 447, issued on June 13, 2007. The judge disagreed with various unpublished opinions of the Appellate Division and of the Law Division, cited to him by DeRose's counsel, which had held that property owners preserve their right to contest blight designations as a condemnation defense, even if more than forty-five days have elapsed from the adoption of a redevelopment designation and plan.[15]
The next day, September 7, 2007, the judge entered an order authorizing the Agency to exercise its power of eminent domain and to appoint commissioners. However, the judge temporarily prohibited the Agency from seeking actual possession for thirty days, allowing DeRose time to obtain a stay pending appeal from this court. As anticipated, DeRose appealed[16] and applied for such a stay, which we denied. However, as of the time of the most recent oral argument before us, DeRose remains in possession of his property.
The Consolidated Appeals and The Amicus Curiae
After initially hearing argument in DeRose I in November 2007, we consolidated that first appeal with the second appeal, DeRose II, concerning the eminent domain action, and listed the consolidated actions for reargument. Because the matter raises a substantial challenge to the constitutionality of the notice provisions in the LRHL, particularly N.J.S.A. 40A:12A-6, we requested the Attorney General to participate as amicus curiae, see R. 4:28-4(a), and we thereafter granted the amicus participation of the Public Advocate. Counsel also advised us of the pendency of the Harrison Eagle and Amaral appeals. Those appeals by other property owners involve overlapping issues concerning the validity of the Harrison redevelopment plan, and the ability of condemnees to challenge a redevelopment designation through a defense in eminent domain actions brought by the Agency. Accordingly, we calendared the Harrison Eagle and Amaral cases back-to-back with DeRose I and DeRose II, and heard a combined oral argument on all four cases on February 4, 2008.
On the whole, DeRose contends that the trial judge erred in dismissing his affirmative claims in DeRose I and his defenses in DeRose II contesting the validity of the Town's redevelopment designation and plan, and the inclusion of his parcel in those measures. He emphasizes that the Town never served him, with personal notice that his property had been designated for redevelopment in September 1997, nor did it advise him that such a designation authorized the Town to take his property against his will. DeRose also contends that the Town should have notified him in 1997 of any time limit on filing any challenge to the designation.
DeRose maintains that the limited notice provisions in the LRHL, as set forth at N.J.S.A. 40A:12A-6, fall short of the norms of due process under the Federal and State Constitutions, and that his facial *76 challenge to the constitutionality of that statute is not time-barred. Maintaining that he is now entitled to judicial review of the blight designation for his property, DeRose urges that such review should proceed under the stringent standards for such designations recently enunciated by the Supreme Court in Gallenthin.
The Public Advocate substantially joins in DeRose's contentions. The Public Advocate also contends that if Section 6 of the LRHL is read to preclude a property owner from challenging a blight designation as a defense in an ensuing condemnation action, the statute violates principles of separation of powers. Specifically, the Public Advocate asserts that the statute cannot trump the Supreme Court's paramount authority over court procedures, including actions in lieu of prerogative writs, under the Judicial Article of the 1947 State Constitution. See N.J. Const. art. VI, § 2, ¶ 3 and art. VI, § 5, ¶ 4; see also Winberry v. Salisbury, 5 N.J. 240, 74 A.2d 406, cert. denied, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950).[17]
Respondents, the Town of Harrison, the Harrison Planning Board and the Harrison Redevelopment Agency (collectively, "respondents") urge that the trial judge's rulings of untimeliness be affirmed. They contend that DeRose was obligated to contest the inclusion of his property within the area designated in 1997 for redevelopment long before the Agency brought an eminent domain action against him a decade later in 2007. Respondents maintain that a contrary judicial holding, at least if it were applied retrospectively, would signal the "death knell" for redevelopment in Harrison and other municipalities.
Respondents maintain that they adhered to all procedures called for under the LRHL, and that, in particular, they were not obligated to provide any further individual notices to DeRose or other similarly-situated property owners beyond the notices mailed before the August 7, 1997 Planning Board meeting. They further contend that the notice provisions in the LRHL are constitutional, and that nothing in the Supreme Court's opinion in Gallenthin undermines the trial court's findings of untimeliness.
In answer to the Public Advocate, respondents contend that the LRHL does not violate principles of separation of powers. They assert that the trial judge properly exercised his judicial discretion in disallowing DeRose's untimely challenges to the redevelopment designation. Respondents further maintain that they were entitled to rely upon the unpublished opinion in Pathparc, and that the "interest[s] of justice" would not be served here by relaxing the forty-five-day deadline under R. 4:69-6(c).
In her amicus brief, the Attorney General defends the constitutionality of the LRHL and, in particular, the notice provisions in N.J.S.A. 40A:12A-6. The Attorney General agrees with DeRose that the statute should not be read to preclude a judge, in appropriate circumstances, from allowing a property owner to contest a blight designation by way of defense in an ensuing condemnation action. In that vein, the Attorney General maintains that the courts retain the power, under R. 4:69-6, to relax the presumptive forty-five-day deadline for such a challenge, in the interests of justice.
The Attorney General suggests that, in making that assessment, judges should consider various factors on a case-by-case *77 basis, including, for example: (1) "the specific nature of the notice provided to the property owner"; (2) "the property owner's knowledge or awareness of the redevelopment activities and of the public entity's intention to acquire his [or her] property through eminent domain"; (3) "the nature and extent of the redevelopment activities and expenditures undertaken by both public entities and private parties in implementation of the redevelopment plan"; and (4) "the time periods that have transpired."
None of the parties before the court embrace the Attorney General's proposed multi-factor test of untimeliness. However, DeRose contends that, if the test were applied to' the record here, he would prevail in preserving his substantive claims. Respondents, on the other hand, argue that DeRose's contentions would still be time-barred under the Attorney General's suggested criteria.
We now address those arguments, as well as the cognate points on those same issues raised by the property owners in, Harrison Eagle and Amaral.

II.
The sovereign power of eminent domain can be traced back to the Magna Carta in England. See Abbott v. Beth Israel Cemetery Ass'n of Woodbridge, 13 N.J. 528, 543-44, 100 A.2d 532 (1953). The scope of that power in our country has always been subject to constitutional and statutory limits. See U.S. Const. amend. v. and XIV; Kelo v. City of New London, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005); Chicago, B. & Q.R.R. Co. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897) (applying the Takings Clause to the states through the Fourteenth Amendment); see also N.J.S.A. 20:3-1 to -50 (the Eminent Domain Act).
The constitutional roots of eminent, domain have been recognized in our State since its very inception. Both the 1776 and the 1844 Constitutions of New Jersey reposed in the Legislature those sovereign powers that had been historically recognized in the common law of England, including the power of eminent domain. See Abbott, supra, 13 N.J. at 544, 100 A.2d 532; see also N.J. Const. of 1776 ¶ 22; N.J. Const. of 1844 art. IV, § 1, ¶ 1. The 1844 Constitution added a specific restriction, paralleling the Federal Takings Clause, that private property may not be taken for public use without paying just compensation to the owner. N.J. Const. of 1844 art. I, § 16 and art. IV, § 7, ¶ 9; see generally Robert F. Williams, The New Jersey Constitution, 47-48 (1997).
The present Constitution, enacted in 1947, extends our tradition of requiring that private property may only be taken for a "public use," and affirms the owner's entitlement to just compensation from the government. See N.J. Const. art. I, ¶ 20; Twp. of W. Orange v. 769 Assocs., 172 N.J. 564, 572, 800 A.2d 86 (2002). Additionally, our State Constitution independently assures that a person may not be deprived by the government of his or her rights, including property rights, without due process of law. See N.J. Const. art. I, ¶ 1; Twp. of W. Orange, supra, 172 N.J. at 572, 800 A.2d 86.
Among its various reforms, the 1947 Constitution specifically expanded the notions of "public purpose" and "public use" that may support a taking to include the government's acquisition of so-called "blighted" property for purposes of redevelopment. In particular, Article VIII, Section 3 of the 1947 Constitution, known as the Blighted Areas Clause, declares in its first sentence:
The clearance, replanning, development or redevelopment of blighted areas shall *78 be a public purpose and public use, for which private property may be taken or acquired.
[N.J. Const. art. VIII, § 3, ¶ 1 (emphasis added).]
The Clause goes on to state, in pertinent part:
Municipal, public or private corporations may be authorized by law to undertake such clearance, replanning, development or redevelopment; and improvements made for these purposes and uses, or for any of them, may be exempted from taxation, in whole or in part, for a limited period of time. . . . The conditions of use, ownership, management and control of such improvements shall be regulated by law.
[Ibid.]
This constitutional declaration is of enormous significance in the context of eminent domain. That is so because the Clause makes a finding of blight a sufficient predicate for the taking of an owner's property, irrespective of the specific public use to which that blighted property is thereafter utilized. See also Vineland Constr. Co. v. Twp. of Pennsauken, 395 N.J.Super. 230, 250, 928 A.2d 856 (App.Div.2007) ("[A] valid redevelopment determination satisfies the public purpose requirement").[18]
"Although the Blighted Areas Clause undoubtedly enlarges the Legislature's eminent domain power to include the taking of private property for redevelopment purposes . . . the Judiciary is the final arbiter of the institutional commissions articulated in the Constitution." Gallenthin, supra, 191 N.J. at 358, 924 A.2d 447 (internal citations omitted). "By adopting the Blighted Areas Clause, the People entrusted certain powers to the Legislature, and the courts are responsible for ensuring that the terms of that trust are honored and enforced." Id. at 358-59, 924 A.2d 447. Hence, the Blighted Areas Clause "operates as both a grant and limit on the State's redevelopment authority." Id. at 359, 924 A.2d 447.
The term "blighted," as it is used in the Blighted Areas Clause, was intended to refer to "`depressed'" properties that have fallen in value and cause a "`tide of deterioration'" that extends to neighboring areas. Id. at 360-61, 924 A.2d 447 (quoting Jane Barus, Proceedings of the New Jersey Constitutional Convention of 1947, vol. I at 742-43). The Clause was mainly designed "to enable `the rehabilitation of our cities.'" Id. at 360, 924 A.2d 447 (quoting Barus at 744). The 1947 framers were "concerned with addressing a particular phenomenon, namely, the deterioration of `certain sections' of `older cities' that were causing an economic domino effect devastating surrounding properties." Id. at 361-62, 924 A.2d 447. To address those concerns, the Blighted Areas Clause enables municipalities "to intervene, stop further economic degradation, and provide further incentives for private investment." Id. at 362, 924 A.2d 447.
The LRHL and the Statutory Concept of "Blight"
Redevelopment statutes adopted prior to the LRHL typically used the term "blight" to describe such deterioration. See, e.g., the Blighted Areas Act, N.J.S.A. 40:55-21.1(e) *79 (repealed 1992 and superseded by the LRHL); see also the 1946 Urban Redevelopment Law, L. 1946, c. 52 (repealed 1992), and the 1944 Redevelopment Companies Law, L. 1944, c. 169 (repealed 1992); Forbes v. Bd. of Trs. of S. Orange Viii., 312 N.J.Super. 519, 712 A.2d 255 (App.Div.), certif den., 156 N.J. 411, 719 A.2d 642 (1998) (tracing the history of our State's redevelopment legislation). In 1992, the Legislature replaced the Blighted Areas Act with the LRHL.
As part of its provisions, the LRHL substituted the term "blight" with the phrase "area in need of redevelopment." See N.J.S.A. 40A:12A-3 (definitional section). One of the reasons for this change in nomenclature was to expand the concept to refer to more than urban "`slum clearance,'" and to cover deteriorated suburban or rural areas as well. Gallenthin, supra, 191 N.J. at 363, 924 A.2d 447 (quoting Levin v. Twp. Comm. of Bridgewater, 57 N.J. 506, 511-16, 274 A.2d 1 (1971)). Nonetheless, the concept "retains its essential characteristic: deterioration or stagnation that negatively affects surrounding properties." Ibid. The term "blighted" is thus to be treated synonymously with the phrase "in need of redevelopment." See Concerned Citizens of Princeton, Inc. v. Mayor of Princeton, 370 N.J.Super. 429, 436, 851 A.2d 685 (App. Div.), certif den., 182 N.J. 139, 861 A.2d 844 (2004); Hirth v. City of Hoboken, 337 N.J.Super. 149, 154 n. 1, 766 A.2d 803 (App.Div.2001).
In Gallenthin, our Supreme Court invalidated a blight designation made under N.J.S.A. 40A:12A-5(e), which provides that property may be designated in need of redevelopment if it has exhibited
[a] growing lack or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein or other conditions resulting in a stagnant or not fully productive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare.
[Ibid.]
The municipality in Gallenthin had argued that Section 5(e) was essentially a catch-all provision, which swept into its ambit any private property that was stagnant or not fully productive. Gallenthin, supra, 191 N.J. at 355-56, 924 A.2d 447. The Court disagreed, finding that such a broad definition contravenes the Blighted Areas Clause, as it would make most property within the State eligible for redevelopment and subject to eminent domain. Id. at 359, 365, 924 A.2d 447. The 1947 Constitution confines the meaning of "blighted areas," explained the Court, to areas that have negatively affected surrounding areas because of their deterioration or stagnation. Id. at 363, 924 A.2d 447. To conform N.J.S.A. 40A:12A-5(e) to the Blighted Areas Clause, the Court interpreted that subsection of the LRHL as relating only to property that was not properly utilized because of issues of title, diversity of ownership, or other similar conditions. Id. at 367-68, 924 A.2d 447.
Additionally, an area in need of redevelopment "may include lands, buildings, or improvements which of themselves are not detrimental to the public health, safety or welfare, but [whose] inclusion . . . is found necessary, with or without change in their condition, for the effective redevelopment of the area of which they are a part." N.J.S.A. 40A:12A-3 (definitional section). This authority to include ancillary, non-blighted parcels in a redevelopment plan, if necessary for the rehabilitation of a larger blighted area, stems from laws in existence prior to the LRHL's adoption. See Gallenthin, supra, 191 N.J. at 372, 924 A.2d 447; Levin, supra, 57 N.J. at 539-40, *80 274 A.2d 1. In the present case, the vast majority of the Harrison parcels analyzed in the Gruel Report were deemed to be in need of redevelopment in their own right, and relatively few were ancillary properties included only by necessity.
Redevelopment Procedures Under the LRHL
Section 6 of the LRHL establishes a multi-step procedure for municipalities to pursue redevelopment activities. First, "the governing body of the municipality shall, by resolution, authorize the planning board" to conduct what is described as "a preliminary investigation." N.J.S.A. 40A:12A-6(a). That preliminary investigation shall "determine whether the proposed area is a redevelopment area according to the criteria set forth in [S]ection 5 of [the LRHL]." Ibid.
After conducting a public hearing on that preliminary investigation, the planning board shall recommend to the governing body whether or not the delineated area, or any portion of it, should be determined to be in need of redevelopment. N.J.S.A. 40A:12A-6(b)(5). Upon receiving such a recommendation from the planning board, the governing body "may adopt a resolution determining that the delineated area, or any part thereof, is a redevelopment area." Ibid. The municipal clerk must transmit any such resolution of the governing body to the State Department of Community Affairs ["DCA"] for review. Ibid. If the DCA Commissioner does not issue an approval or disapproval of the municipal resolution within thirty days, the designation automatically takes effect. Ibid.
A governing body's designation of an area in need of redevelopment, assuming that it is not rejected by the DCA, carries with it great legal significance. In particular, Section 6 of the LRHL recites that "[t]he determination, if supported by substantial evidence and, if required, approved by the [DCA] [C]ommissioner, shall be binding and conclusive upon all persons affected by the determination." Ibid. (Emphasis added.) Furthermore, such an area designated by the governing body "shall be deemed a `blighted area' for the purposes of [the Blighted Areas Clause] of the Constitution." N.J.S.A. 40A:12A-6(c). This means that the government's acquisition of property in the redevelopment area shall be treated as a legitimate "public purpose" for purposes of constitutional takings law. See Vineland Constr., supra, 395 N.J.Super. at 250, 928 A.2d 856.
Once a municipality has designated a redevelopment area, it may then enact a redevelopment plan by ordinance. N.J.S.A. 40A:12A-7. The adoption of such a plan empowers the municipality, or a redevelopment agency that the municipality creates, to conduct a variety of activities concerning the properties within the redevelopment area. N.J.S.A 40A:12A-6(c) and -8.[19]
*81 Most significantly for the present appeals, a governing body's adoption of a redevelopment designation and a redevelopment plan authorizes the municipality or its redevelopment agency to "[a]cquire, by condemnation, any land or building which is necessary for the redevelopment project, pursuant to the provisions of the `Eminent Domain Act of 1971,' P.L. 1971, c. 361." N.J.S.A. 40A:12A-8(c). The LRHL's cross-reference to the Eminent Domain Act strongly indicates a legislative desire that the two statutes be applied to a particular redevelopment initiative in a coordinated and harmonized fashion.
Section 6's Notice Provisions
The notice provisions in Section 6 of the LRHL, N.J.S.A. 40A:12A-6, which are at the core of the present appeals, specify a number of procedures. Before conducting its preliminary investigation of a redevelopment proposal, the planning board must prepare a map. N.J.S.A. 40A:12A-6(b)(1). The map must show "the boundaries of the proposed redevelopment area and the location of the various parcels of property" included within it. Ibid. The planning board must then issue a notice announcing the date, time, and place of a public hearing on the preliminary investigation. N.J.S.A. 40A:12A-6(b)(3). The notice must be published twice in a local newspaper. Ibid. In addition, "[a] copy of the notice shall be mailed at least ten days prior to the date set for the hearing to the last owner, if any, of each parcel of property within the [proposed redevelopment] area according to the assessment records of the municipality." Ibid. Despite these detailed requirements, the statute dilutes their apparent legal significance by adding a proviso that the "[f]ailure to mail any such notice shall not invalidate the [preliminary] investigation or determination thereon." Ibid.
At the public hearing concerning the preliminary investigation, the planning board is to hear "all persons who are interested in or would be affected by a determination that the delineated area is a redevelopment area." N.J.S.A. 40A:126(b)(4). Objections, whether oral or in writing, "shall be received and considered and made part of the public record." Ibid.
Despite the fact that Section 6 of the LRHL requires the planning board to entertain both oral and written objections to a preliminary investigation, the statute treats those persons who file written objections disparately from those who only state their opposition orally. Such written objectors are also given special treatment over property owners in the redevelopment zone who do not speak up at the planning board hearing or who do not attend it. Specifically, Section 6(b)(6) provides that:
(6) If written objections were filed in connection with the [planning board] hearing [on the preliminary investigation], the municipality shall, for 45 days next following its determination to which the objections were filed, take no further action to acquire any property by condemnation within the redevelopment area.
[N.J.S.A. 40A:12A-6(b)(6) (emphasis added).]
Absent such written objections, the municipality may accelerate its acquisition of properties within the redevelopment area through the power of eminent domain.
Section 6 of the LRHL further purports to limit the time in which a person who had filed a written objection to a redevelopment designation may file an action in lieu of prerogative writs to challenge that designation in court. In particular, it states:
If a person who filed a written objection to a determination by the municipality *82 pursuant to this subsection shall, within 45 days after the adoption by the municipality of the determination to which the person objected, apply to the Superior Court, the court may grant further review of the determination by procedure in lieu of prerogative writ[s]; and in any such action the court may make any incidental order that it deems proper.
[N.J.S.A. 40A:12A-6(b)(7) (emphasis added).]
Curiously, the statute contains no similar forty-five-day time limit for court challenges brought by residents who had raised only oral objections at the hearing, or who did not object, at all.
The genesis of the forty-five-day time limitation in N.J.S.A. 40A:12A-6(b)(7) is unclear.[20] The logic of imposing a strict litigation deadline upon persons who went to the trouble of lodging their objections to the planning board in writing, while at the, same time seemingly imposing no deadline on those who objected orally or did not object at all, is hard to fathom. On the other hand, the LRHL does convey, at least in part, a legislative sentiment that attacks upon a blight designation should be litigated promptly.
The LRHL calls for no other individualized notices to be mailed to property owners beyond the initial planning board phase when the "preliminary investigation" takes place. See N.J.S.A. 40A:12A-6(b)(3). Moreover, when and if a municipal governing body adopts a resolution designating an area for redevelopment, the statute prescribes that notice of that determination only needs to be served within ten days "upon each person who [had] filed a written objection thereto and stated, in or upon the written submission, an address to which notice of determination may be sent." N.J.S.A. 40A:12A-6(b)(5) (emphasis added). Hence, persons in the redevelopment area such as DeRose, who did not file a written objection at the planning board stage, are not entitled under the LRHL to notice of what the governing body subsequently did with the planning board's recommendation. Instead, such interested parties must depend upon publication notice in local newspapers, or through word of mouth in the community, to know what has transpired.
This constricted notice arrangement in the LRHL carries into the subsequent municipal decision-making phase, at which the governing body adopts, through an ordinance, a specific redevelopment plan. In this later phase, the statute does not require individual notice to be sent to any residents in the redevelopment zone, even those who previously had lodged objections in writing. To the contrary, the LRHL specifies that "no notice beyond that [ordinarily] required for [the] adoption of ordinances by the municipality shall be required for the [governing body's] hearing on or adoption of the redevelopment plan or subsequent amendments thereof." N.J.S.A. 40A:12A-7(c).
In sum, the LRHL's notice scheme is spotty and incomplete. Individual notices mailed to all property owners in the designated zone are only specified for the initial planning board hearing to consider the "preliminary investigation." Thereafter, no individual notices are called for, except for notice of the governing body's adoption of a redevelopment designation, which is mailed only to the select few persons who take the time and effort to file a written objection with the planning board. And no *83 one is statutorily entitled to individual notice of the town's ensuing adoption of a redevelopment plan, not even those whose properties are covered by that plan,
DeRose and' the Public Advocate severely criticize these statutory notice provisions. They argue that the LRHL's faulty and incomplete procedures leave many property owners in the dark, ignorant of the fact that their properties may eventually be taken by the municipality against their will. They also contend that it is unfair to place such residents "on the clock," with a forty-five-day deadline for filing a prerogative writs action, without at least telling them when that clock has begun ticking, and advising them of the deadline by which they must go to court to assert their rights.
R. 4:69-6 and the Presumptive Forty-Five-Day Time Limitation on Prerogative Writ Actions
The forty-five-day deadline for certain actions in lieu of prerogative writs, as it is expressed in N.J.S.A. 40A:12A-6(b)(7), mirrors the presumptive forty-five-day filing period specified in R. 4:69-6. Subsection (a) of that Court Rule provides that "[n]o action in lieu of prerogative writs shall be commenced later than [forty-five] days after the accrual of the right to review, hearing or relief claimed[.]" R. 4:69-6(a). The Rule does not define by its terms when rights "accrue" to trigger the forty-five-day period, but instead leaves the question of accrual to substantive law. See Mill Race, Ltd. v. Mayor of Bernards Twp., 230 N.J.Super. 160, 168, 553 A.2d 44 (App.Div.) (reversing trial court's finding that an objector's right to judicial review had accrued), certif denied, 117 N.J. 154, 564 A.2d 874 (1989); Trenkamp v. Twp. of Burlington, 170 N.J.Super. 251, 259-66, 406 A.2d 218 (Law Div.1979) (discussing the difficulties that can arise in deciding when a cause of action had accrued for purposes of R. 4:69-6, noting that "[m]ere ignorance of a cause of action will not automatically lead to a waiver of the [forty-five-day] limitation," and that a court instead "must balance the equities of the case").
The forty-five-day limitation in the Rule "`is designed to give an essential measure of repose to actions taken against public bodies.'" Tri-State Ship Repair & Dry Dock Co. v. City of Perth Amboy, 349 N.J.Super. 418, 423, 793 A.2d 834 (App. Div.), certif. denied, 174 N.J. 189, 803 A.2d 1161 (2002) (quoting Washington Twp. Zoning Bd. of Adj. v. Washington Twp. Planning Bd., 217 N.J.Super. 215, 225, 525 A.2d 331 (App.Div.), certif. denied, 108 N.J. 218, 528 A.2d 36 (1987)).
However, R. 4:69-6 also permits the court to enlarge the forty-five-day period, where warranted in the "interest of justice." R. 4:69-6(c); see also Reilly v. Brice, 109 N.J. 555, 558, 538 A.2d 362 (1988). Although we suspect that the forty-five-day statutory limitation for prerogative writ actions contained in Section 6 of the LRHL may have been consciously patterned by its drafters after the forty-five-day general limitation in R. 4:69-6, we have found no legislative history that confirms that suspected linkage.

Constitutional Due Process Requirements
As a constitutional matter, DeRose and the Public Advocate argue that the notice provisions in the LRHL are invalid under the Due Process Clause of the Federal Constitution, U.S. Const. amend. V, as incorporated to the States under the Fourteenth Amendment, U.S. Const. amend. XIV. They separately contend that Section 6 of the LRHL also violates principles of the New Jersey Constitution, which recognizes in Article I, paragraph 1 that citizens of our State have "certain natural and unalienable rights," including specifically the rights of "acquiring, possessing, and *84 protecting property." Moreover, the courts of our State have long recognized that "no person shall be deprived of his or her property without due process of law." Twp. of W. Orange, supra, 172 N.J. at 572, 800 A.2d 86 (citing N.J. Const. art. I, ¶ 20; State v. Heppenheimer, 54 N.J.L. 268, 272, 23 A. 664 (Sup.Ct.1892)).
DeRose and the Public Advocate urge that due process and adequate notice are profoundly important in redevelopment matters, because a governmental designation of blight under the LRHL carries with it the power to condemn and acquire a citizen's private property. As the LRHL provides, the blight designation, if supported by substantial evidence, "shall be binding and conclusive upon all persons affected by the determination." N.J.S.A. 40A: 12A-6(b) (5).
The power to condemn property "involves the exercise of one of the most awesome powers of government." City of Atlantic City v. Cynwyd Invs., 148 N.J. 55, 73, 689 A.2d 712 (1997). As such, that power "must always be exercised in the public interest." Ibid. Although the United States Supreme Court's majority opinion in Kelo, supra, upheld, as a matter of Federal constitutional law, the government's power to take private property to promote certain economic development, it recognized "the hardship that condemnations may entail, notwithstanding the payment of just compensation." Kelo, 545 U.S. at 489, 125 S.Ct. at 2668, 162 L.Ed.2d at 457. The Kelo majority also took pains to "emphasize that nothing in [its] opinion precludes any State from placing further restrictions on its exercise of the takings power." Ibid. See, e.g., Gallenthin, supra, 191 N.J. at 373, 924 A.2d 447 ("Although community redevelopment is an important municipal power, that authority is not unfettered"). Nothing in Kelo authorizes governmental bodies to ignore norms of due process and procedural fairness in going about the acquisition of private land in the name of redevelopment.
At its core, due process requires adequate notice and an opportunity to be heard, whether analyzed under the Federal Constitution or under the New Jersey Constitution. See Rivera v. Bd. of Review, 127 N.J. 578, 583, 606 A.2d 1087 (1992); see also Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865, 873 (1950). "Put simply, the citizen facing a loss at the hands of the State must be given a real chance to present his or her side of the case before a government decision becomes final." Rivera, supra, 127 N.J. at 583, 606 A.2d 1087.
As a precondition of such a "real chance" to object, there must be adequate notice of what the government intends to do. Hence, "`[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" N.J. Higher Educ. Assistance Auth. v. Pennell, 377 N.J.Super. 13, 24-25, 871 A.2d 671 (App.Div.2005) (quoting Mullane, supra, 339 U.S. at 314, 70 S.Ct. at 657, 94 L.Ed. at 873).
In determining what specific form of process may be due under the Constitution, the touchstone "is not abstract principle but the needs of the particular situation." Rivera, supra, 127 N.J at 583, 606 A.2d 1087 (citing Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972)); see also Twp. of Montville v. Block 69, Lot 10, 74 N.J. 1, 13, 376 A.2d 909 (1977). Due process is therefore a "flexible" concept that "depends on the particular circumstances." *85 Doe v. Poritz, 142 N.J. 1, 106, 662 A.2d 367 (1995); see also City of E. Orange v. Kynor, 383 N.J.Super. 639, 648, 893 A.2d 46 (App.Div.), certif. denied, 188 N.J. 352, 907 A.2d 1012 (2006).
The Application of Constitutional Notice Requirements to the LRHL
We evaluate the notice provisions of the LRHL guided by these well-settled principles. As a threshold matter, we reject the contention that it is too late for DeRose to present to the courts a facial attack upon the statute's constitutionality. The forty-five-day limitation of R. 4:69-6, which pertains solely to municipal action subject to attack through an action in lieu of prerogative writs, does not constrain a challenge to a State statute. Nor are we persuaded that DeRose somehow waived his ability to challenge the constitutionality of a State law. See County of Morris v. Fauver, 153 N.J. 80, 104, 707 A.2d 958 (1998) (waiver is the "`intentional relinquishment of a known right'" (citation omitted)). The record is barren of such a voluntary and conscious relinquishment. Similarly, the doctrine of laches does not preclude us from considering the constitutional merits of the statute and rendering a judicial declaration as to its validity. See Ballantyne House Assocs. v. City of Newark, 269 N.J.Super. 322, 330, 635 A.2d 551 (App.Div.1993). Although DeRose initially yielded to the application of the statute before the Agency began taking his property, "[a]cquiescence for no length of time can legalize a clear violation of duty where the people have plainly expressed their will in the Constitution and have appointed judicial tribunals to enforce it." Asbury Park Press, Inc. v. Woolley, 33 N.J. 1, 14, 161 A.2d 705 (1960) (citing State v. Wrightson, 56 N.J.L. 126, 28 A. 56 (Sup. Ct.1893)).
When the LRHL was enacted in 1992, it did not become insulated from future constitutional scrutiny just because no one promptly filed a lawsuit to challenge its validity under the Due Process Clause. The fact that others since 1992 may have assumed and relied upon a belief that the LRHL is constitutional does not immunize it from review. Consequently, we set aside the trial judge's ruling that DeRose was time-barred in challenging the facial constitutionality of N.J.S.A. 40A:12A-6.[21]
Turning to the merits of the argument, we approach the statute with a presumption that the Legislature would not have intended to adopt an unconstitutional enactment. State v. Profaci, 56 N.J. 346, 349, 266 A.2d 579 (1970). As the Supreme Court recently noted in Gallenthin, supra, in addressing different substantive attacks on the LRHL, "`[e]ven though a statute may be open to a construction which would render it unconstitutional or permits its unconstitutional application, it is the duty of this Court to so construe the statute as to render it constitutional if it is reasonably susceptible to such interpretation.'" Gallenthin, supra, 191 N.J. at 359-60, 924 A.2d 447 (quoting State v. Miller, 170 N.J. 417, 433, 790 A.2d 144 (2002)).
With respect to the adequacy of governmental notice in the particular setting of redevelopment and eminent domain, the Second Circuit Court of Appeals' decision in Brody v. Vill. of Port Chester, 434 F.3d *86 121 (2d Cir.2005), is instructive.[22]Brody involved the condemnation of property for a redevelopment project in New York State. Consistent with New York's Eminent Domain Procedure Law, N.Y. Em. Dom. Proc. §§ 101-709 ("EDPL"), the defendant Village scheduled a public meeting to address the basis for the condemnation, but only posted the notice in the newspaper and did not mail notice to the plaintiff condemnee or to any other property owner. Brody, supra, 434 F.3d at 124. The plaintiff contended that the town had violated his right to due process by not sending him notice of the meeting, and also by not notifying him that, pursuant to the EDPL, he had only thirty days to challenge the public-use basis for the condemnation. Id. at 127.
The Second Circuit in Brody agreed, holding that the Fourteenth Amendment requires service by mail to the condemnees when a town is aware of their addresses and they are not so numerous as to make individual notice impractical. ld. at 129 (relying on Mullane, supra, 339 U.S. at 318, 70 S.Ct. at 659, 94 L.Ed. at 875). To sufficiently alert the condemnee of his or her right to challenge the public use underlying the taking, Brody also held that the government's notice had to instruct that the condemnee had thirty days to raise such a challenge: Id. at 132. The New York Legislature cured these defects by amending the statute in 2004 and upgrading its notice provisions. See N.Y. Em. Dom. Proc., §§ 202 and 204.
Similar reasoning applies here. First of all, numerosity is not an obstacle to due process in the redevelopment arena. The LRHL itself presumes that property owners located within an area targeted for redevelopment are not too numerous to receive individual notices by mail, because it calls for such mailed notice of the Planning Board's hearing on its preliminary investigation of the proposed redevelopment area. See N.J.S.A. 40A:12A-6(b)(3). Such initial notice is then supplemented by general publication in a local newspaper. Ibid.[23]
The statute lacks, however, any individualized mechanism to assure that property owners are fairly informed that the blight designation, if approved by the governing body, operates as a conclusive finding of public purpose that will authorize the government to condemn their properties. The statute also fails to require that owners be apprised of any time limits for contesting a blight designation. Additionally, the statute omits any obligation to notify owners individually that the governing body has designated their premises as in need of redevelopment, except for those prescient owners who filed a written objection with the Planning Board.
Respondents suggest that the constitutional duty of fair notice can be satisfied merely by cross-referencing the LRHL in the text of the notices mailed to residents prior to the initial planning board hearing. We disagree, Such a bare allusion to the redevelopment statute is patently insufficient to cut off a future condemnee's rights. Laypersons who receive such a notice cannot reasonably be expected to understand the drastic and permanent consequences of a municipality including *87 their property within an area designated for redevelopment.
Indeed, the euphemistic term "redevelopment" itself has the capacity to lull an uninformed citizen into presuming that such activity will be personally beneficial, without realizing that the concept also signifies that he or she may be ousted from home or business at the government's pleasure. A similar false sense of security may be conveyed by the statutory phrase "preliminary investigation." More sophisticated persons may, in fact, be aware of the possible consequences of redevelopment, but they still may not appreciate that their own property is included within the area designated for redevelopment, or be aware of the means and timetable for legally challenging a future taking of their premises.
Even a diligent property owner who goes to the trouble of consulting the LRHL could easily assume from the literal wording of N.J.S.A. 40A:12A-6 that he or she is not bound by any forty-five-day limit to take the matter to court, so long as he or she had not filed a written objection with the planning board. Such persons who had not filed a written objection, might not learn that the governing body did, in fact, designate their property as blighted until someone comes knocking at their door years later. Furthermore, a property owner might have little practical incentive to file suit at the time of the blight designation, since a municipality might ultimately abandon or revise its redevelopment efforts, and therefore not need to take the property after all.
These many considerations persuade us that the LRHL's notice provisions fall short of fundamental guarantees of due process, both under the Federal Constitution as well as the Constitution of this State. The amount of notice currently prescribed by Section 6 simply is not "reasonably calculated" to apprise property owners of the true nature of the government's actions, see Mullane, supra, 339 U.S. at 314, 70 S.Ct. at 657, 94 L.Ed. at 873, and to afford them a "real chance" to contest those actions. Rivera, supra, 127 N.J. at 583, 606 A.2d 1087. Although a select group of residents in the targeted redevelopment area may understand what is actually going on, far too many citizens are left in the twilight zone of ignorance.
A Saving Construction Harmonizing the LRHL with the Eminent Domain Act
Despite these obvious shortcomings, we do not have to strike down Section 6 of the LRHL, because the statute's constitutionality can be saved by interpreting it in a manner that safeguards the due process rights of property owners, while still remaining faithful to the apparent objectives of the Legislature. In particular, Section 6 may be saved from invalidation by construing the law in a fashion that preserves the ability of a property owner to contest a blight designation for his or her property until the time that the government, if ever, moves to invoke its powers of eminent domain. By holding that such an affirmative defense by the property owner is preserved, the notice defects in the original blight designation are sufficiently cured to avoid an unconstitutional deprivation.
As we noted at the outset of this opinion, the unreported case law to date is divided on whether a property owner who fails to challenge a blight designation within forty-five days of its adoption by a governing body in an affirmative lawsuit may still advance such a challenge as a defense in an ensuing condemnation action. We are aware of at least two unreported opinions of this court that have answered that question in the affirmative, and at least two others, including Pathparc, that have answered it in the negative. The unreported decisions of trial judges on this subject are *88 likewise conflicting. In addition, at least one unreported federal district court opinion has construed our state laws as preserving such a defense to condemnation. The time has come for the issue to be addressed in this reported opinion, not only for the benefit of the litigants before us, but also for the guidance of the bench, the bar, municipal officials, and the public at large, unless and until our Supreme Court or the Legislature mandates a different approach that is consistent with the Federal and State Constitutions.
In ruling on this pivotal issue, we bear in mind that the government's taking of property for purposes of redevelopment implicates not one, but two, statutes: the LRHL and the Eminent Domain Act. The Eminent Domain Act, which is expressly cross-referenced within the LRHL, see N.J.S.A. 40A:12A-8(c), plays an equally important role in the redevelopment context. We would be remiss if we considered the issues of timeliness that are before us by only looking to the LRHL, and ignored the Eminent Domain Act's separate expressions of legislative intent.
The Eminent Domain Act prescribes a comprehensive sequence of procedures that regulate the manner and terms by which a governmental body in New Jersey may forcibly take a private citizen's property. The Eminent Domain Act "provides a uniform procedure to be followed by all entities who have the powers to condemn." Twp. of Hillsborough v. Robertson, 260 N.J.Super. 37, 42, 614 A.2d 1374 (Law Div.1992); see also Magliochetti v. State, 276 N.J.Super. 361, 371, 647 A.2d 1386 (Law Div.1994).
Nothing in the Eminent Domain Act imposes a time limit by which a property owner may interpose an argument that the government lacks a valid public purpose to take his or her property. Instead, the Eminent Domain Act envisions that the court hearing a condemnor's application to take property will have the plenary authority to resolve "all matters" pertinent to the taking. This wide-ranging authority is expressed in Section 3-5 of the Act as follows:
The court shall have jurisdiction of all matters in condemnation, and all matters incidental thereto and arising therefrom, including, but without limiting the generality of the foregoing, jurisdiction to determine the authority to exercise the power of eminent domain; to compel the exercise of such power; to fix and determine the compensation to be paid and the parties entitled thereto, and to determine title to all property affected by the action.
[N.J.S.A. 20:3-5 (emphasis added).]
This statutory mandate has been broadly construed and repeatedly enforced. See, e.g., Schiavone Constr. Co. v. Hackensack Meadowlands Dev. Comm'n., 98 N.J. 258, 265-66, 486 A.2d 330 (1985); Orleans Builders & Developers v. Byrne, 186 N.J.Super. 432, 446, 453 A.2d 200 (App. Div.), certif. denied, 91 N.J. 528, 453 A.2d 851 (1982); State v. Orenstein, 124 N.J.Super. 295, 298, 306 A.2d 479 (App.Div.), certif. denied, 63 N.J. 588, 311 A.2d 10 (1973); Magliochetti, supra, 276 N.J.Super. at 371, 647 A.2d 1386.
The LRHL does not repudiate or qualify these fundamental jurisdictional precepts embodied in the Eminent Domain Act. Nor does the legislative history of the 1992 LRHL, which post-dates the Eminent Domain Act of 1971, contain any indication that the Legislature intended the LRHL to circumscribe the scope of defenses that may be asserted by a condemnee.
When a court "reviews two separate but related statutes, the goal is to harmonize the statutes in light of their purposes." Am. Fire & Cas. Co. v. N.J. *89 Div. of Taxation, 189 N.J. 65, 79-80, 912 A.2d 126 (2006); Saint Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14, 878 A.2d 829 (2005). "The Legislature is presumed to be familiar with its own enactments, with judicial declarations relating to them, and to have passed or preserved cognate laws with the intention that they be construed to serve a useful and consistent purpose." State v. Federanko, 26 N.J. 119, 129, 139 A.2d 30 (1958). Consequently, "courts have the duty of reconciling them so as to give effect to both expressions of the lawmakers' will." Id. at 130, 139 A.2d 30.
The Related Significance of Kelo and Gallenthin
Additionally, takings jurisprudence, in the wake of Kelo at the national level and Gallenthin in our own State, offers a substantial rationale for allowing a condemnee a fair and final opportunity to test the sovereign's exercise of authority when it is invoked in the name of redevelopment. Even the Justices in the Kelo majority, who voted to sustain the city's exercise of eminent domain to advance a waterfront redevelopment project, acknowledged that "the necessity and wisdom of using eminent domain to promote economic development are certainly matters of legitimate public debate." Kelo, supra, 545 U.S. at 489, 125 S.Ct. at 2668, 162 L.Ed.2d at 458.
Since Kelo was decided, greater judicial and legislative scrutiny of redevelopment-based takings has occurred. See, e.g., Franco v. Nat'l Capital Revitalization Corp., 930 A.2d 160, 169 (D.C.2007) (allowing a condemnee to plead claims that the government's asserted public use for his property was pretextual, noting Kelo's admonition that government may not "`take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit'") (quoting Kelo, supra, 545 U.S. at 478, 125 S.Ct. at 2661, 162 L.Ed.2d at 450); Mayor of Baltimore v. Valsamaki, 397 Md. 222, 916 A.2d 324, 334 (2007) (rejecting a city's exercise of "quick take" condemnation powers for redevelopment purposes, citing the Supreme Court's "controversial" decision in Kelo and the need for judicial scrutiny in enforcing the constitution's public use requirement); City of Norwood v. Homey, 110 Ohio St.3d 353, 853 N.E.2d 1115, 1138 (2006) (reversing a municipal finding that an area targeted for redevelopment was blighted or deteriorated, noting the courts' "critical" role, after Kelo, in reviewing public use designations with "vigilance").[24] Here in New Jersey, our Supreme Court in Gallenthin has clarified that the municipal power to pursue redevelopment is "not unfettered," and that our State Constitution "reflects the will of the [p]eople regarding the appropriate balance between municipal redevelopment and property owners' rights." Gallenthin, supra, 191 N.J. at 373, 924 A.2d 447.
The Preservation of Defenses in the Absence of Adequate Notice, and a Countervailing Presumption Where the Notice Is Sufficient
Mindful of that delicate balance of competing public and private interests, we endeavor to harmonize the terms of the Eminent Domain Act and the LRHL in a *90 manner that adheres to the norms of procedural fairness embedded in the Federal and State Constitutions. We are convinced that, in the absence of a fuller notice that fairly informs property owners of the consequences of a municipal redevelopment designation, minimal compliance with the notice provisions set forth in N.J.S.A. 40A:12A-6 is simply not enough to extinguish a property owner's right to contest a blight designation as a defense in a future condemnation action. To hold otherwise would produce an injustice not countenanced by either the Constitution or by the laws of our State. The Legislature has specifically instructed that a judge hearing an eminent domain case "shall" retain jurisdiction over "all matters incidental thereto and arising therefrom." N.J.S.A. 20:3-5. We do not read the notice provisions in the LRHL as emasculating that long-standing mandate.
Specifically, we hold that a property owner generally preserves the right to challenge the validity of a municipal designation that his or her property is in need of redevelopment, or is necessary to accomplish the redevelopment of nearby premises, through the assertion of a defense in an eminent domain action. Such a defense is preserved, beyond forty-five days after the governing body has ratified the redevelopment designation by resolution under N.J.S.A. 40A:12A-6(b)(5). The only exception to that principle applies where the municipality has chosen to go beyond the limited terms of N.J.S.A. 40A:12A-6 and has provided the property owner with contemporaneous individual written notice that fairly alerts the owner that (1) his or her property has been designated by the governing body for redevelopment, (2) the designation operates as a finding of public purpose and authorizes the municipality to take the property against the owner's will, and (3) informs the owner of a presumptive time limit within which the owner may take legal action to challenge the designation.
If the municipality's notice to the individual property owner contains these constitutionally-essential features, then an owner who wishes to challenge the designation presumptively must bring an action in lieu of prerogative writs within forty-five days of the governing body's adoption of the designation. The recipient of such notice generally cannot wait to raise those objections as a defense in a future condemnation action. This presumption of time bar shall be especially strong with respect to general attacks on the redevelopment that are not specific to the owner's parcel, such as, for example, contentions that the governing body adopted the designation without complying with the Open Public Meetings Act, N.J.S.A. 10:4-6 to -21.
By recognizing such a presumption in instances of sufficient constitutional notice, we strive to accommodate the legislative aims of both the LRHL and the Eminent Domain Act. We are cognizant that Section 6 of the LRHL expresses, albeit in a peculiar and incomplete manner, a legislative desire to resolve the bona fides of a redevelopment designation in an expeditious manner. We are equally cognizant that the Eminent Domain Act contains a broad declaration of the scope of issues that are justiciable in a condemnation action.
Given the overlapping subject matters of the two statutes, we perceive that the Legislature would prefer to have at least generalized attacks on the redevelopment effort litigated to conclusion before the municipality completes the time-consuming and expensive process of acquiring each parcel in the redevelopment zone. The presumption we have articulated serves as a reasonable means to achieve that goal, without unduly trampling the interests of property owners in the path of *91 redevelopment. The approach we thus fashion continues, in the spirit of Gallenthin, to accommodate "the appropriate balance between, municipal redevelopment and property owners' rights." Gallenthin, supra, 191 N.J. at 373, 924 A.2d 447. The approach further seeks to achieve a reasonable accommodation of the policy objectives underlying, on the one hand, the LRHL and, on the other hand, the Eminent Domain Act. In particular, we conceive that the Legislature would prefer that general claims seeking to invalidate an entire redevelopment project be adjudicated sooner rather than later, subject to the Constitution's overarching mandates of due process.
The presumption that we recognize today in cases of adequate notice is not immutable. In particular, trial judges must retain the residual power to extend the time for a property owner to assert all claims of invalidity of a redevelopment designation, whether general or property-specific, where the interests of justice so require. See R. 4:69-6(c). Such residual authority is mandated by our State Constitution, which reserves for our judiciary the sovereign authority to "make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts." N.J. Const. art. VI, § 2, ¶ 3; see also Winberry, supra, 5 N.J. at 245, 74 A.2d 406 (interpreting the "subject to the law" proviso in the Judicial Article as pertaining to legislative enactments of substance rather than of procedure); Knight v. City of Margate, 86 N.J. 374, 389-90, 431 A.2d 833 (1981). Our Supreme Court has already exercised its authority in this regard, by incorporating the "interest of justice" exception to enlarge the forty-five-day period in R. 4:69-6 governing actions in lieu of prerogative writs. See R. 4:69(c). Additionally, we note that the Court Rules pertaining to condemnation actions in general, R. 4:73-1 to R. 4:73-11, contain no limitation on the scope of defenses that may be asserted by a condemnee in an eminent domain proceeding.[25]
Judges therefore maintain the authority to allow condemnees, who have received constitutionally-sufficient notice at the redevelopment designation stage, to reserve until the condemnation stage all or some of their arguments against the validity of blight designation. In deciding whether the presumption may be overcome, in full or in part, the court may look to the kinds of factors suggested by the Attorney General in this case, including but not limited to, (1) the property owner's actual knowledge of the pendency and progress of the redevelopment, (2) the nature and extent of the redevelopment activities and expenditures, and (3) the length of time that has passed.
Summary
In sum, the constitutionality of N.J.S.A. 40A:12A-6 may be preserved by reading its provisions in a manner that affords property owners with a baseline of adequate notice, and with a fair opportunity to be heard in opposition to a redevelopment designation. Such a balanced, notice-based approach also avoids a constitutional infirmity under the Winberry doctrine and corresponding principles of separation of powers. It is also substantially consistent with the terms and policies of the Eminent Domain Act.
The constitutional solution that we have adopted should not, as a practical matter, unduly hamper municipalities and redevelopment agencies. If such public *92 entities wish to expedite potential challenges to the bona fides of a particular redevelopment scheme, they can substantially achieve that goal by enhancing the quality and specificity of the notice that they choose to furnish to property owners as they proceed with the redevelopment approvals. The better the notice to property owners, the better the municipality's chances of achieving finality sooner. On the other hand, if public entities fail to supply residents with fair notice, then they bear the risk of encountering more opposition later on at the condemnation stage.
Even though such opposing arguments will be cognizable as a defense in condemnation, the municipality has little to fear if its redevelopment plan is well-grounded in the first place. As Gallenthin instructs, the municipality must have, under N.J.S.A. 40A:12A-5(e), "substantial evidence" that the property in question is in need of redevelopment because it "has become stagnant and unproductive [due to] issues of title, diversity of ownership, or other conditions of the same kind." Gallenthin, supra, 191 N.J. at 372-73, 924 A.2d 447. Lastly, we note that the passage of time and the pace of redevelopment acquisitions principally lies within the control of the municipality itself,

III.
Applying these precepts to the present case, the conclusion is inescapable that DeRose was not provided with fair and adequate notice that could eradicate his right to defend his property against a forcible governmental taking. The notice that he received, prior to the Planning Board's meeting of August 7, 1997, said nothing about the Town's right to take his property if the Mayor and Council of Harrison thereafter ratified the recommendations of the Gruel Report and the Planning Board. The notice did not even make plain on its face that the subject property was indeed included in the area targeted for redevelopment. Nor did the notice furnish DeRose with any inkling that he needed to take legal action in court, within forty-five days after the Mayor and Council acted on the designation, in order to preserve his rights.
The manifest deficiencies of the written notice in this case were compounded by the inaccurate statements made both by Gruel and the Planning Board's attorney at the August 7, 1997 meeting, and also by the Board's handout circulated to the residents in attendance. Those spoken and printed words may have been well-in-tended, but they surely downplayed any potential negative consequences of a redevelopment designation, and discouraged residents from mounting a challenge to the redevelopment initiative at that time.
We recognize that DeRose himself did not attend the August 7, 1997 meeting. Had DeRose done so, or had he spoken to a fellow resident who was present or had seen the Board's handout, he would not have gained much insight into the true long-term consequences of what was transpiring in his Town.
The record in this case is an apt illustration of the dangers of a municipality withholding from the public the bad news that at times may accompany the potential good news promised by redevelopment. "In dealing with the public, the government must turn square corners." FMC Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 425, 495 A.2d 1313 (1985) (internal citation omitted). This maxim is especially true in the context of a public agency's taking of private land for redevelopment, one in which the "government has an overriding obligation to deal forthrightly and fairly with property owners." Jersey City Redev. Agency v. Costello, 252 N.J.Super. 247, 257, 599 A.2d 899 (App. *93 Div.), certif. denied, 126 N.J. 332, 598 A.2d 890 (1991).
Apart, from these deficiencies at the Planning Board stage, it is undisputed that DeRose was never supplied with contemporaneous written notice when the Town's governing body on September 4, 1997, did, in fact, designate his property and other properties in Harrison as being in need of redevelopment. We appreciate that the LRHL, as written, did not specifically require such personal notice. Even so, the absence of such notice signifies that DeRose should now receive the full constitutional benefits of due process in the eminent domain phase.
We recognize that the trial judge did not hinge his determinations of DeRose's alleged untimeliness upon N.J.S.A. 40A:12A-6, and that the judge instead relied upon R. 4:69-6 and upon general concepts of lathes and repose. For the reasons that we have already explained, those considerations must give way here to the dictates of the Constitution. Moreover, as we also have noted, R. 4:69-6 does not apply to a condemnation action, or to the defenses that may be asserted in such actions. Cf. R. 4:73 (procedures for eminent domain actions). The trial judge also did not take into account the jurisdictional breadth of the Eminent Domain Act, as is specified in N.J.S.A. 20:3-5.
Even if, for the sake of argument, the forty-five-day limitation of R. 4:69-6 were to apply to this condemnation action against DeRose, we are also satisfied that the legitimacy of the blight designation is of sufficient public importance to warrant an enlargement of that time, and merits consideration of DeRose's arguments. See Concerned Citizens of Princeton, supra, 370 N.J.Super. at 447, 851 A.2d 685; Brunetti v. Borough of New Milford, 68 N.J. 576, 586, 350 A.2d 19 (1975). The multiple defects of notice in this case fortify that conclusion.
Consequently, we conclude that the trial judge erred in rejecting as time-barred DeRose's challenges to the blight designation. Given the Town's failure to provide him with constitutionally-adequate notice, DeRose is entitled to contest the blight designation as a defense in the eminent domain action that the Agency has now brought against him.
Respondents insist that DeRose's substantive defenses to the taking should be time-barred, because he admittedly knew of the Town's plan to take his property for redevelopment by at least 2004, and because DeRose did not attempt to litigate the issues until 2006. However, given the unsettled and conflicting state of our law on these issues to date, we cannot fault DeRose or his counsel for not coming to court sooner. Even if DeRose could have and should have known in 2004 that his ownership was in peril and that he could still tight the blight designation in court, he had no obligation to do so in these circumstances until the Agency exercised the Town's eminent domain powers and served him with a complaint in condemnation. That conclusion is not overly indulgent of DeRose or of other Harrison property owners, but rather is a fair consequence of the municipality's own constitutional failures.
Thus, this matter must be remanded to the Law Division to consider the merits of DeRose's substantive argument that the Town's blight designation was invalid, both in general and specifically as applied to his own property. Both arguments are preserved here, because of the notice defects we have identified. In directing such further proceedings, we are acutely conscious that several millions of dollars have already *94 been expended in Harrison on its redevelopment initiative over the past decade. Those expenditures cannot, however, justify the abnegation of a property owner's statutory rights. See Pond Run Watershed Ass'n v. Twp. of Hamilton Zoning Bd. of Adj., 397 N.J.Super. 335, 365-66, 937 A.2d 334 (App.Div.2008).
At oral argument, we explored with counsel the substantive criteria of blight that should apply to DeRose's claims, in the event that the matter were remanded. DeRose submits that the blight criteria of Gallenthin should be applied. He further contends that, under those criteria, the Agency's condemnation action must be dismissed because the Gruel Report's analysis of his property lacks any express finding that his property "has become stagnant and unproductive because of issues of title, diversity of ownership, or other conditions of the same kind." Gallenthin, supra, 191 N.J. at 373, 924 A.2d 447. Respondents, on the other hand, question whether the criteria of Gallenthin, a case which was decided in 2007, apply to the municipal blight designation issued by Harrison in 1997. Respondents further argue that even if Gallenthin applies to this case, substantial evidence nonetheless exists to demonstrate that DeRose's parcel fulfills those criteria.
Although the issue of Gallenthin's retroactivity is ultimately one for our Supreme Court, we presume that the holding has at least "pipeline retroactivity" to cases such as this matter, which was pending in the court on June 13, 2007 when Gallenthin was decided. See Beltran v. DeLima, 379 N.J.Super. 169, 174, 877 A.2d 307 (App. Div.2005); see also Henderson v. Camden County Mun, Auth., 176. N.J. 554, 561, 826 A.2d 615 (2003) ("Generally, judicial decisions are applied retroactively to all civil matters that have not reached final judgment").
Recognizing, however, that Gallenthin construed subsection 5(e) of the LRHL more narrowly than prior case law had, we believe that the Agency should have the right to amplify the record on remand, beyond the contours of the Gruel Report. We believe that it is fairest to permit the Agency a chance to marshal other substantial evidence to justify the taking of DeRose's property under the Gallenthin standards. See Lyons v. City of Camden, 48 N.J. at 524, 533, 226 A.2d 625 (1967).[26] Likewise, DeRose may also expand the record in the trial court to develop, factually and through expert testimony, his challenge to the blight determination. Hirth, supra, 337 N.J.Super. at 162, 766 A.2d 803. We defer to the trial judge's discretion in overseeing an appropriate round of discovery, and the exchange of new or supplemental expert reports to address the pertinent blight factors. We therefore decline DeRose's request that we exercise our original jurisdiction on the subject and that we dismiss outright the Agency's condemnation action against him.

IV.
For these reasons, we hold that the notice provisions in Section 6 of the LRHL are constitutional, but only if property owners who are not fairly informed contemporaneously of the municipality's adoption of a blight designation, and the true *95 nature and consequences of that designation, preserve the ability to contest the designation by way of a defense in an ensuing condemnation action. Nothing in our opinion forecloses, however, the Legislature[27] from enhancing the minimal amount of notice presently called for in the LRHL to a constitutional level that might curtail, at least presumptively, the viability of all or some future defenses by condemnees after a fair time interval has elapsed.
The final judgments of the Law Division respectively dated September 22, 2006[28] in A-0958-06T2, and dated September 7, 2007 in A-0382-07T2, are vacated, and the matter is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] A-0958-06T2 was previously argued on November 5, 2007, without the amicus curiae, before this same panel, and was then reargued, along with A-0382-07T2, with the participation of the amicus curiae.
[2] See Harrison Redev. Agency v. Harrison Eagle LLP, et al., A-4474-06T2, 2008 WL 482596 ("Harrison Eagle"), and Harrison Redev. Agency v. Amaral Auto Ctr., Inc., et al., A-3862-06T2, 2008 WL 482573 ("Amaral").
[3] DeRose, a defendant in both consolidated actions, is also a third-party plaintiff and counterclaimant in A-0958-06T2.
[4] DeRose has objected to this figure as too low. Because the eminent domain proceedings are not completed, we do not have in the record before us a competing appraisal.
[5] Adler was also a principal in properties now owned by Harrison Eagle, LIP, which is an appellant in the Harrison Eagle companion case. DeRose purchased the property from Adler on September 8, 1997.
[6] That other property, which DeRose apparently thereafter sold, is not involved in the present litigation. A copy of the signature card for the letter to DeRose containing the notice for that other property, signed by DeRose's wife, is included in the record.
[7] At this point in the proceeding, the transcript reflects that Gruel handed the complaining property owner an extra copy of the report. The transcript does not reflect whether that copy was shared with any other persons in the audience.
[8] This attorney is not respondents' counsel on the present appeals.
[9] The record supplied to us does not contain copies of the public notices or the listed agenda for that September 4 meeting.
[10] The issues of environmental access have evidently been resolved, at least on an interim basis, and have not been raised in the present appeals.
[11] For historical reasons we explain, infra, in Part II of this opinion, we shall use the terms "blighted" and "in need of redevelopment" interchangeably.
[12] See Pathparc Assocs., LLC v. Town of Harrison, et al., Nos. A-3417-01 and A-3641-01 (App.Div. April 23, 2003). For reasons we discuss, infra, in Part II, the constitutional and eminent domain issues now before us, in the context of defenses to a condemnation action, are different from those presented to us in Pathparc. Additionally, Pathparc, as an unpublished decision, is not binding on DeRose, and does not constrain our independent review of the discrete issues now before us. We cite to Pathparc only because of its relevance to the procedural history of Harrison's redevelopment in general. See R. 1:36-3.
[13] That appeal is docketed as A-0958-06T2 and we refer to it as "DeRose I."
[14] We note that the same trial judge also issued the time bar rulings in Harrison Eagle and in Amaral.
[15] As we have noted, there are other unpublished trial and appellate opinions that have reached a contrary result to the cases cited by DeRose.
[16] This second appeal is docketed as A-0382-07T2, and we refer to it as "DeRose II"
[17] These arguments, as well as others, are substantially adopted by the property owners in Harrison Eagle and Amaral.
[18] We do not address the hypothetical question of whether there may be circumstances in which a redevelopment designation that passes muster under the Blighted Areas Clause of the State Constitution might still be invalid under the Takings Clause of the Federal Constitution, which generally has been read to be more permissive of the public purposes allowable for such acquisitions. See Kelp, supra, 545 U.S. at 489-90, 125 S.Ct. at 2668, 162 L.Ed.2d at 457-58 (noting that "many States already impose `public use' requirements that are stricter than the federal baseline").
[19] Those powers include, among other things, the issuance of bonds to finance the redevelopment, N.J.S.A. 40A:12A-8(a); the clearing of land and the construction of streets, utilities and other site improvements, N.J.S.A. 40A:12A-8(d); the retention of planners, architects, engineers or other professionals, N.J.S.A. 40A:12A-8(e); the issuance of contracts with public agencies or redevelopers to undertake redevelopment projects, including the extension of loans and various other financing options, N.J.S.A. 40A:12A-8(f); the leasing or conveying of property or improvements without public bidding, N.J.S.A. 40A:12A-8(g); the completion of surveys, borings and other on-site tests, N.J.S.A. 40A:128(h); relocation assistance for residents or businesses displaced from the redevelopment area, N.J.S.A. 40A:12A-8(i); and the power to otherwise "[d]o all things necessary or convenient to carry out its powers," N.J.S.A. 40A:12A-8(n).
[20] The predecessor statute, the Blighted Areas Act, had provided for a thirty-day limitation. See Griggs v. Borough of Princeton, 33 N.J. 207, 224, 162 A.2d 862 (1960) (construing the judicial review requirements of the Blighted Areas Act).
[21] We also note that the central authority relied upon by the trial judge on this point, Sonderman v. Remington Constr. Co., 127 N.J. 96, 603 A.2d 1 (1992), is inapposite because that case did not involve a facial challenge to the constitutionality of a State statute. DeRose's challenge asserts that the notice provision of the LRHL is unconstitutional on its face, not that he received defective notice pursuant to an otherwise-constitutional procedure.
[22] Although we consult Brody and its application of federal due process principles, we recognize that we are not bound by Brody, and that it is not dispositive of our own constitutional analysis, which we reach independently:
[23] The caveat in N.J.S.A. 40A:12A-6(b)(3), stating that a "[f]ailure to mail any such notices shall not invalidate the investigation or [its] determination," only strengthens DeRose's claim that the statute as a whole falls short of due process requirements.
[24] Legal scholars have also recognized Kelo's widespread impact in heightening and animating public concerns about the governmental taking of private property for redevelopment purposes. See, e.g., Jane B. Baron, Winding Toward the Heart of The Takings Muddle: Kelo, Lingle and Public Discourse About Private Property, 34 Fordham Urb, L.J. 613 (2007); Daniel J. Curtin, Jr., The Implications of Kelo in Land Use Law, 46 Santa Clara L.Rev. 787 (2006); Julia D. Mahoney, Kelo's Legacy: Eminent Domain and The Future of Property Rights, 2005 Sup.Ct. Rev. 103 (2005); Hon. Peter G. Sheridan, Kelo v. City of New London: New Jersey's Take on Takings, 37 Scion Hall L.Rev. 307 (2007).
[25] Of course, the usual thirty-five-day deadline under R. 4:6-1 for the filing of an answer or other responsive pleading after service is effected applies to a defendant condemnee.
[26] On remand, the Agency equitably should be permitted to demonstrate, in the alternative, that DeRose's property, even if it is not itself blighted, is necessary "for the effective redevelopment of the area of which [it] is a part." N.J.S.A. 40A:12A-3 (definitional section); see also Gallenthin, supra, 191 N.J. at 372, 924 A.2d 447.
[27] We are aware that in the 2006-2007 legislative session several bills were introduced to amend the Eminent Domain Act and the LRHL, but none were enacted into law. Some of those measures would have enhanced the LRHL's notice provisions. We express no advisory opinion, of course, as to whether such proposed legislation would have satisfied constitutional requirements. See Proprietary Ass'n v. Board of Pharmacy, 16 N.J. 62, 72, 106 A.2d 272 (1954) (recognizing that the judiciary should refrain from rendering advisory opinions, particularly with respect to "[v]ital social issues . . . upon which the Legislature ought to have full opportunity to express itself").
[28] We recognize that the Agency's complaint in DeRose I involved a demand for access to the subject premises, rather than a condemnation action. However, we also note that the Agency provisions for preliminary entry predicated its demand for access under the Eminent Domain Act, see N.J.S.A. 20:3-16. There is also substantial overlap between appellant's counterclaim and third-party claims in DeRose I and his condemnation defenses and counterclaims in DeRose II. Given these inter-related circumstances, we shall treat all of DeRose's contentions against the Town and its respective agencies as preserved for purposes of the remanded consolidated actions.