**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2203-19

BRIAN M. STEINER,

     Plaintiff-Respondent/
Cross-Appellant,

v.

ANN E. STEINER,

     Defendant-Appellant/
Cross-Respondent.

_____

> Argued November 3, 2021 – Decided November 23, 2021
>
> Before Judges Fisher, DeAlmeida and Smith.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0541-17.
>
> Andrew M. Shaw argued the cause for appellant/cross-respondent (Shaw Divorce & Family Law LLC, attorneys; Andrew M. Shaw, on the briefs).
>
> Britt J. Simon argued the cause for respondent/cross-appellant (Simon Law Group, LLC, attorneys; Joel Friedman, on the briefs).

PER CURIAM

Defendant Ann Steiner appeals, and plaintiff Brian Steiner cross-appeals, from various portions of an amended final judgment of divorce and a subsequent order addressing counsel fees. Other than remanding for findings about a $75,000 counsel fee award in Brian's favor, we find no merit in the parties' arguments and affirm.

The parties were married in 1986 and have two adult children. Brian filed a complaint seeking a divorce in 2016. After a considerable period of discovery and a sixteen-day trial occurring over non-consecutive days starting in October 2018 and ending in May 2019, the trial judge rendered thorough findings of fact. In his equitable-distribution rulings, the judge largely divided the parties' assets equally except he awarded Ann one-third the value of Pioneer Box Company, Inc., a close corporation formed by Brian that was the source of his income during the marriage. The judge also awarded various other credits to the parties and granted Ann open durational alimony of $10,500 per month.

The appeal and cross-appeal raise numerous issues, all of which were fully explored during the lengthy trial. The parties testified at length as did: their two

children[1]; Kalman Barson, an accountant who testified for Brian about Pioneer's value; Jerome Kootman, an accountant who testified for Brian about the parties' tax returns; David Murphy, a private investigator who testified for Brian about surveillance conducted on Ann; Ilan Hirschfeld, an accountant who testified for Ann about Pioneer's value; Mark Tinder, an appraiser who testified for Ann about the value of the marital home; Steven Lieberman, Esq., who testified for Ann regarding the real estate transactions involving Ann's mother; and Thomas Folk, Ph.D., who testified for Ann about the value of the art and collectibles in the marital home. Well into the trial, the judge expressed frustration with the parties' failure to provide sufficient information about their property and appointed as his own expert, William J. Morrison, CPA, of WithumSmith+Brown, PC, who provided reports and testified at length.

The judge rendered his oral opinion on May 14, 2019, resolving numerous hotly-contested fact disputes. The parties thereafter had difficulties agreeing on a suitable judgment of divorce conforming to the judge's decision, and motions inevitably followed. Ultimately, on the dangling counsel-fee issue, the judge awarded Brian $75,000, but he did not elaborate as to how that number was

---

[1] The parties' son and daughter were born in 1993 and 1997, respectively. The trial judge found both were emancipated.

reached except to note a reduction in the award Brian sought was appropriate because Ann's counsel did "more than anybody else" to "bring finality" to the impasse about the form of the judgment of divorce.

In approaching the many issues raised by the parties in their cross-appeals, we observe that our standard of review requires deference to judge-made fact findings supported by substantial credible evidence, Cesare v. Cesare, 154 N.J. 394, 413 (1998), and that standard is fully applicable here. Satisfied, also, that the judge applied correct legal principles, and finding no abuse of discretion in his determination on the numerous issues criticized by both parties, we affirm, except we will remand for further consideration and additional findings on the $75,000 fee award.

We briefly explain our disposition of some of the issues the parties have raised about: (1) alimony; (2) the awarding to Brian of a Mallamo[2] credit; (3) the valuation of Pioneer and how it was distributed; (4) Ann's claim to a credit for advanced equitable distribution to Brian; (5) the valuation of the marital artwork, jewelry, and furnishings; (6) Ann's claim to a violation of her due process rights with regard to Morrison's testimony; (7) the imposition of a bar

[2] Mallamo v. Mallamo, 280 N.J. Super. 8 (App. Div. 1995) (recognizing the authority to provide a credit that accounts for a pendente lite support award that proved, after trial, to be too high or too low).

on Ann's communications to Pioneer clients as a condition of her receipt of alimony; and (8) counsel fees.

I

In affirming the judge's alimony determination, we reject Ann's argument that the judge miscalculated or misconstrued the parties' marital lifestyle and Brian's income. In crafting the alimony award, the judge considered all the factors delineated in N.J.S.A. 2A:34-23(b). The marriage lasted for thirty years. The judge found Brian in excellent health and Ann in poor health. As to the factors described in subsection (5) and (6) of N.J.S.A. 2A:34-23(b), the judge found Brian will continue to have an income but, because of her health, Ann cannot work. The judge also found each party will receive substantial assets due to his equitable-distribution determinations. Both parties were fully educated before they met. Regarding the history of financial and non-financial contributions to the marriage, the judge found Ann "didn't do a lot of things around the home that many stay-at-home parents do" because of her medical condition. The judge recognized each party received "very substantial" equitable-distribution awards, approximating $4,000,000 each, and that Ann could earn $2,000 per month from investment income. Among other things, the judge considered and rejected an imputation of income to Brian based on a claim

5

of underemployment, finding he is "working hard enough to service and grow his business."

The goal in fixing a proper award of alimony is "to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16 (2000). A judge has broad discretion in this regard, Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012), and, because of the particular expertise of family judges, we accord considerable deference. Although our deference is not "limitless," we will not intervene if the judge has "frame[d]" his rulings with the statutory factors set forth in N.J.S.A. 2A:34-23(b). Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 2004), aff'd as modified, 183 N.J. 290 (2005). In short, we will not disturb an alimony award if the judge's conclusions are consistent with the law and not "manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice." Foust v. Glaser, 340 N.J. Super. 312, 316 (App. Div. 2001); see also J.B. v. W.B., 215 N.J. 305, 326 (2013) (invoking the same test when reviewing an order granting or denying an application to modify child support).

We are abundantly satisfied there is no principled reason for appellate intervention here. The judge systematically and carefully addressed all the

appropriate statutory factors and considered the parties' case information statements, their testimony about lifestyle and financial matters, and all the written evidence in determining the parties' lifestyle.

We reject Ann's argument that the judge made inconsistent and deficient findings regarding the marital lifestyle in his alimony determination. The judge provided a thorough discussion of the marital standard of living while correctly recognizing it was very difficult to accurately gauge the parties' lifestyle here since neither party produced any evidence of their pre-2016 spending. The judge, however, found Ann's case information statements to be "incredibly unreliable." For example, Ann asserted she incurred $141,197 in monthly expenses; this included sums for her own alcohol and tobacco use even though she testified she neither smoked nor drank. The judge found her alleged monthly expenses included some "outrageous sums," which "just have to be simply discarded." He found Brian's case information statements were "closest" to reality and that Brian's May 10, 2017 case information statement, which listed total monthly expenses slightly under $10,000, was the most accurate indication of the marital lifestyle. With some sensible adjusting because of increasing health insurance costs, eliminating college and litigation costs, and increasing the savings component, the judge concluded the monthly marital lifestyle

A-2203-19

amounted to $13,100. From that, the judge subtracted the $2,000 in investment income available to Ann, and $1,500 for one half of the $3,000 marital savings component attributable to Brian, thereby reaching the award of $10,500 per month in open-durational alimony.

The totality of the circumstances, as demonstrated by the evidence found credible, supported the judge's factual underpinnings and ultimate conclusion about a fair and equitable level of alimony. We reject the suggestion that the judge's findings in this regard were unsupported by the evidence he found credible, let alone "manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice." Foust, 340 N.J. Super. at 316.

## II

Ann argues the judge erred in awarding Brian a Mallamo credit of $140,000 and in failing to award her any such credit. We disagree.

It would have been inequitable to deny Brian a Mallamo credit. The pendente lite order required Brian's payment of $22,000 per month; the ultimate alimony award revealed that the pendente lite level was far too high and, to equitably adjust for that circumstance, the judge found Brian entitled to a credit

for the $7,000 monthly excess he had paid for twenty months, for a total credit of $140,000.

As we recognized in Mallamo, pendente lite support orders are subject to retroactive adjustment both prior to and at the time of the final judgment. See also Slutsky v. Slutsky, 451 N.J. Super. 332, 368 (App. Div. 2017). A fair and equitable final adjustment should account for a mistakenly high or low pendente lite support award, and the judge acted well within his discretion here. We find no merit in Ann's argument to the contrary.

## III

The judge fixed Pioneer's value at $1,300,000 as of December 29, 2016, and awarded Brian sole ownership of Pioneer while determining that Ann was entitled to compensation for one-third the value, thereby awarding her a credit of $429,000. He rejected Ann's claim for one-half of the cash in Pioneer's business account, finding no support for that argument because the cash was reflected in the value of the business. Ann argues the judge erred in evaluating Pioneer by failing to consider Morrison's cash flow analysis, by improperly reducing her share as a sanction for bad faith, and by failing to account for Pioneer's undistributed cash.

The judge, in a lengthy and thorough analysis, acknowledged the issue was "complicated." He determined that Pioneer was an "active, profitable" business which was not in financial distress, but which had lost certain major customers in the two years before trial. The judge found Brian made all reasonable efforts to keep the business running and "worked very hard" to build and maintain the business, while Ann contributed "little or nothing" to its growth and maintenance.

The judge also found that cars, rent, and travel expenses were "run through the business" and family members were put on the payroll, so that Pioneer's true operating expenses were unclear. For this reason, he concluded the "valuation calculations are more accurate when annual revenues as opposed to annual net profits" are used. Barson used "gross receipts" and Hirschfeld used both "net sales" and "revenue" to determine Pioneer's value. The judge found both experts knowledgeable, credible, and thoroughly prepared, and further found that Barson's testimony on the impact of the loss of Volvo was more persuasive, while Hirschfeld's testimony suggesting the use of the income approach to value, instead of the asset approach, was most persuasive.

The judge also found that fixing Pioneer's value as of a date certain, such as the date of the complaint, while "ignoring the proven decrease" in revenues

"would not be fair." He thus credited Hirschfeld's "income approach" valuation of $1,520,000 as the "most sensible" value of the company, because it utilized actual results of operations from 2017 and the first half of 2018. But the judge also determined that that value had to be adjusted downward because Pioneer's growth rate, as opined by Hirschfeld, was "simply too high," culminating in a determination fixing Pioneer's value at $1,300,000. The judge explained all these findings in his thoughtful oral opinion; those findings are deserving of our deference.

In determining how to allocate Pioneer's value between the two marital partners, the judge concluded it would be inequitable to divide it equally because of Ann's bad faith, "designed solely to harass the plaintiff, disrupt his business, annoy the business customers, and damage the value of Pioneer." Ann's bad faith was further revealed by her service of subpoenas on Pioneer's clients, a step the judge found was intended to "upset" Brian. That, as well as the fact that Ann had not contributed to Pioneer's growth, and that Pioneer's appreciation was brought about solely by Brian's efforts, the judge awarded Brian sole ownership of Pioneer, with a thirty-three percent credit, or $429,000, to Ann.

"There are probably few assets whose valuation imposes as difficult, intricate and sophisticated a task as interests in close corporations." Lavene v.

Lavene, 148 N.J. Super. 267, 275 (App. Div. 1977). Although there are different valid approaches to valuation of close corporations, "[f]lexibilty must be the byword in determining which approach is best" because "valuation is an art rather than a science." Steneken, 183 N.J. at 297. The "goal is to arrive at a fair market value [for a business] for which there is no market." Bowen v. Bowen, 96 N.J. 36, 44 (1984).

There is also "no absolutely iron-clad rule for determining the date of evaluation but use of a consistent date is preferable, such as the filing of the complaint, or perhaps the time of the hearing, depending on the nature of the asset and any compelling equitable considerations." Bednar v. Bednar, 193 N.J. Super. 330, 332 (App. Div. 1984). A "proper factor in that determination is any significant change in the valuation . . . that occurs prior to final judgment." Scherzer v. Scherzer, 136 N.J. Super. 397, 400 (App. Div. 1975).

The judge appropriately considered all evidence in the record regarding the appropriate valuation method and the value itself. He thoughtfully described the reports and testimony from Barson and Hirschfeld, and adopted Hirschfeld's valuation using the discounted cash flow method, based on the income approach, and adjusted that figure to account for a reduced growth rate consistent with the

testimony about the loss of clients. We have been presented with no principled reason for second-guessing the experienced judge's determination.

We reject any remaining aspects of Ann's arguments about Pioneer's value and how it was equitably distributed, finding those arguments to be of insufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

IV

Ann argues that the judge erred in failing to award her a credit for Brian's advance on equitable distribution. She alleged that Brian took "$600,000 and at least another $187,491.91" when he was only permitted to take $500,000. The judge, however, found Brian credible when he testified that the only advance he received on equitable distribution was the $187,491.91 he withdrew from Magyar Bank in August 2017, that was ultimately returned. His moving of $600,000 in Pioneer funds was not an advance on equitable distribution.

V

The judge awarded sole possession of the artwork, jewelry, and furniture remaining in the marital home to Ann, and awarded Brian a credit of $75,000, representing half its total value which the judge fixed at $150,000. Ann argues

13

that the judge erred in his valuation of marital artwork, jewelry, and furnishings. We again disagree.

The judge considered the conflicting evidence, including Ann's assertions that she spent $2,500 per month on art for approximately ten years, totaling $300,000, though she acknowledged it was worth less than $300,000. She also testified she possessed jewelry worth at least $10,000, and she claimed she spent significant sums on furniture, including more than $9,000 for a couch. Folk appraised the artwork in the marital home, finding it worth $6,900 while the furniture, in his view, was worth $5,125.

The judge primarily credited Ann's testimony that she spent $2,500 per month on artwork for ten years. He found the parties owned at least two valuable paintings, a Ferjo which cost $9,000, and a Diehl, which cost $12,000. The judge acknowledged but did not entirely credit Folk's appraisal and awarded sole possession of all artwork, jewelry, and furniture remaining in the marital home to Ann, while awarding Brian a credit of $75,000, representing half its total value.

The judge's findings are entitled to our deference. His estimate of the total value of the marital artwork, jewelry, and furniture was supported by evidence found credible. Although the valuation is well below Ann's high estimate of

$300,000 for the artwork alone – an estimate revealed by cross-examination of Ann as excessive – it is higher than the appraisal because of testimony about the value of certain pieces of art, and it reflects the judge's consideration of items omitted from the appraisal including Ann's jewelry worth more than $10,000, and expensive furnishings, among other things. Further supporting this valuation is Ann's case information statement, which listed $1,800 per month for art upkeep and care, and $700 per month in jewelry acquisition and care, suggesting an extensive collection of such items.

VI

Ann argues the judge violated her constitutional right to due process through Morrison's involvement in the trial. Specifically, she refers to the fact that the judge limited the parties to an hour each for examination of Morrison that she claims "unreasonably restricted" her ability to review Morrison's reports, cross-examine him, and introduce rebuttal testimony.

At the trial's conclusion, the judge addressed these concerns, concluding that the parties had "ample opportunity to be heard" throughout the lengthy trial. The reference in support of this argument to Morrison's report as being a 400-page document was misleading, as the report included exhibits; the text of

Morrison's initial report was seventeen pages and his supplemental report only seven pages.

Due process is a flexible concept that "depends on the particular circumstances." Doe v. Poritz, 142 N.J. 1, 106 (1995). It requires adequate notice and the opportunity to be heard, Harrison Redevelopment Agency v. DeRose, 398 N.J. Super. 361, 403 (App. Div. 2008), which is further understood as an opportunity to be heard at a meaningful time and in a meaningful manner, Klier v. Sordoni Skanska Const. Co., 337 N.J. Super. 76, 84 (App. Div. 2001). We agree "[e]agerness to move cases must defer to our paramount duty to administer justice in the individual case," Audubon Volunteer Fire Co. No. 1 v. Church Const. Co., 206 N.J. Super. 405, 406 (App. Div. 1986), and the "rights of the parties to a full and fair hearing are paramount," J.D. v. M.D.F., 207 N.J. 458, 481 (2011), but judges are accorded "wide discretion in exercising control over their courtrooms," Martin v. Newark Pub. Schs., 461 N.J. Super. 330, 340 (App. Div. 2019), and broad discretion in controlling cross-examination, State v. Jenewicz, 193 N.J. 440, 467 (2008). Ann was not deprived of her due process rights because she was not entitled to unlimited time to examine witnesses. Indeed, the parties' failure to properly prepare for trial caused extensive delays

– and, indeed, justified the appointment of Morrison – and the record reveals that the judge accommodated the parties constantly throughout the lengthy trial.

It is clear to us that the parties both had ample opportunity to question and elicit information from Morrison. He testified in detail about his reports, and the judge allowed follow-up testimony from the parties themselves to clarify any ambiguities they believed were revealed in Morrison's testimony. Further, as the judge found, the parties had several months of communications with Morrison in which they narrowed the issues for his reports and testimony. His reports themselves were concise and easily digested and the parties had his reports in hand nearly a month before he testified. There was no violation of Ann's due process rights.

VII

As part of the judgment of divorce, the judge deemed it appropriate to limit Ann's communications about Pioneer, providing that, as a "condition of the alimony" she was granted, Ann was prohibited from contacting customers, suppliers, and anyone associated with Pioneer, or to make criticism or disparaging comments about Pioneer or Brian on any social media platform. Ann argues that this provision improperly restricts her constitutional right to free speech.

17

The restriction was triggered by the defense's issuance of subpoenas to five of Pioneer's customers, requesting:

> 1. All records related to products bought from and any other business or prospective business conducted with, Plaintiff, Brian Steiner (born December 15, 1956; Social Security Number . . .) in his personal capacity, and/or in his capacity as the owner and/or employee of Pioneer Box Company, Inc., including but not limited to the following, for the period commencing January 1, 2016 through the date on which records are produced:
>
> > a. Any and all records reflecting the amount of sales, orders, and other business conducted with Brian Steiner, Pioneer Box, or any other entity owned by or affiliated with Brian Steiner; and
> >
> > b. All cancelled checks (both front and back) for all payments made thereto.

At the trial's conclusion, the judge alluded to these subpoenas in support of his decision to award Ann less than fifty percent of Pioneer's value. In so doing, the judge found Ann had acted in bad faith in issuing the subpoenas, which he found were "designed solely to harass [Brian], disrupt his business, annoy the business customers, and damage the value of Pioneer." He also found the issuance of the subpoenas violated an earlier order that barred service of subpoenas on non-parties.

18                                                                    A-2203-19

The authority of a party to issue a subpoena duces tecum under the court's seal is "significant" and "must be exercised in good faith and in strict adherence to the rules to eliminate potential abuses." Cavallaro v. Jamco Prop. Mgmt., 334 N.J. Super. 557, 569 (App. Div. 2000); see also Crescenzo v. Crane, 350 N.J. Super. 531, 533-34 (App. Div. 2002). The need for attorneys and parties to proceed in good faith when invoking the subpoena power is particularly "heightened in matrimonial matters, as the issuance of unauthorized subpoena[s], especially in post-judgment family motion practice, presents great potential for abuse." Welch v. Welch, 401 N.J. Super. 438, 445 (Ch. Div. 2008).

The experienced judge correctly recognized the potential harm in both the issuance of subpoenas to Pioneer's customers and in any future communication by Ann with Pioneer's customers. The judgment provides Ann with compensation for her interest in Pioneer and she will therefore have no ongoing interest in that company except to the indirect extent it provides a livelihood to Brian, who is obligated to pay her alimony. Her communications can only serve to roil the waters and jeopardize the status quo on which her receipt of alimony is dependent.

To be sure, "[e]very person may freely speak, write and publish . . . sentiments on all subjects, being responsible for the abuse of that right." N.J.

Const., art. I, § 6. In our constitutional democracy, the right to express oneself enjoys the fullest and firmest protection. In re Hinds, 90 N.J. 604, 613-14 (1982). In considering any limitation on free speech rights, a court "must weigh the gravity and probability of the harm caused by freely allowing the expression against the extent to which free speech rights would be inhibited or circumscribed by suppressing the expression." Id. at 614.

In this setting, while unusual, restraints on speech have been utilized to protect a party's interests from undue interference. For example, in Borra v. Borra, 333 N.J. Super. 607, 608, 613 (Ch. Div. 2000), a trial judge issued an injunction prohibiting a former husband from contesting his former wife's application for membership in a country club because the children were "significantly involved in Club activities" and would be harmed if the husband objected to the wife's application. While the circumstances here differ from Borra, the approach is the same. The restriction on speech here was limited and designed to protect the very thing that generates the income from which alimony will be paid to Ann. We see no constitutional infirmity in preventing a matrimonial litigant from damaging the structure of a judgment of divorce through reckless communications like those the judge sought to prevent here.

Ann argues that the judge erred in awarding counsel fees to Brian and in denying her own request for fees. In his oral opinion, the judge invoked the relevant statutes and court rules in concluding that, as a general matter, the parties were in the same general position regarding their need for fees and their ability to pay; he found that, for the most part, the parties' positions in this litigation were asserted in good faith or, when extreme positions were taken, they both took competing extreme positions. But the judge also determined that Ann's bad faith in aspects of the litigation warranted an award in Brian's favor that would be reflective of that bad faith and, in the post-trial phase, ruled that Ann should pay Brian $75,000 in fees.

We find no cause to intervene in the judge's findings about Ann's bad faith, but we will remand for further consideration and, certainly, further findings – as required by <u>Rendine v. Pantzer</u>, 141 N.J. 292 (1995) – as to how $75,000 was determined to be a reasonable fee. We, thus, remand for further findings on that issue.

\* \* \*

For these reasons we reject all the parties' arguments posed in their appeal and cross-appeal. Those arguments we have not expressly addressed lacked

sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). We remand only for the judge's findings as to the quantification of the $75,000 fee award in Brian's favor.

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2203-19